KLATMW, Inc. v. Elec. Sys. Prot., Inc., 2011 NCBC 12.

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| | ) | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | ) | 09 CVS 16393 |
| | ) | |
| KLATMW, INC., formerly known as | ) | |
| Electronic Systems Protection Inc. and | ) | |
| successor in interest to Power Quality | ) | |
| Innovations, Inc., KLATMW | ) | |
| INTERNATIONAL, formerly known as | ) | |
| ESP International, KIM ALFREDS, and | ) | |
| TOM WEICKARDT, | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER AND OPINION** |
| | ) | |
| v. | ) | |
| | ) | |
| ELECTRONIC SYSTEMS PROTECTION, | ) | |
| INC., a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

{1}     THIS MATTER is before the Court on cross–motions for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.  For reasons stated below, the Court concludes that both motions should be GRANTED IN PART and DENIED IN PART.

> *Poyner & Spruill LLP, by J. Nicholas Ellis and Troutman Sanders, by Aurora Cassirer,* pro hac vice*, for Plaintiffs KLATMW, Inc., KLATMW International, Kim Alfreds; and Tom Weickardt.*
>
> *Moore & Van Allen PLLC, by Paul J. Peralta and Mark A. Nebrig for Defendant Electronic Systems Protection, Inc.*

Gale, Judge.

## I.  INTRODUCTION

{2}     The pending motions are before the Court on an extensive evidentiary record. Plaintiffs and Defendant as Counter–Plaintiff each present multiple claims.  Each

side asserts that all claims can be resolved summarily. As explained in detail below, the Court concludes that certain claims may be resolved summarily, but certain of Defendant's warranty counterclaims require resolution of facts in material dispute, such that the case should proceed to trial only on these contract related claims. Those claims should be resolved pursuant to New York law.

{3}     The case arises from the sale of assets of an ongoing business pursuant to an asset purchase agreement containing certain warranties, incorporating a choice of law, and providing for certain remedies, with a portion of the purchase consideration held in escrow pending resolution of claims. Plaintiffs instituted the litigation seeking the release of escrowed funds. Defendant presented multiple counterclaims grounded in contract and tort, as well as a statutory claim under Chapter 75 of the North Carolina General Statutes. The warranty claims divide into two segments: a group of warranties that address material changes, in this case specifically changes in regard to one customer; and another regarding the delivery or disclosure of a prior agreement including provisions for confidentiality. Defendant asserts that the tort claims arise from facts related to but in addition to those controlling the warranty claim, and that the claims are premised primarily on Plaintiffs' alleged concealment of facts intended to prevent or foreclose Defendant's further inquiry or discovery of true facts. Plaintiffs contend that the uncontested record demonstrates that they made appropriate and truthful disclosures, so that all counterclaims should be dismissed and the escrow should be released. Defendant contends that the uncontested record demonstrates that the warranties have been breached and that Plaintiffs' disclosures do not dictate a contrary finding, so that the Court should declare that Plaintiffs are liable, and the case should proceed to determine damages.

{4}     On an earlier motion, the Court held that the consensual choice of law clause in the purchase contract dictates the application of New York law to the contract claims. The Court now determines that New York law should control all claims.

The choice of law is significant as to the warranty and statutory claims but not so for the tort claims. New York law provides a particular way to determine first reliance as a part of the essential elements of a warranty claim and, if so, is the instance whether the party has shown whether the beneficiary of warranty has waived any claim for breach of that warranty. The Court concludes that it cannot under these New York standards resolve all the contract claims as a matter of law. New York does not allow a statutory action under these facts comparable to North Carolina's Chapter 75. The statutory claim should then be dismissed. The Court concludes that these tort claims do not survive under either New York or North Carolina law, as the contract should control Defendant's right, if any, to recover.

{5}    New York courts use decidedly different lenses when viewing contract warranty and tort claims, particularly so in how they approach reliance and waivers. New York law provides that reliance is an element of both the contract and tort claims; however, the buyer's burden to show reliance is significantly lessened for a contract warranty claim. Stated generally, so long as a buyer demonstrates that the warranty is a part of the basis of the parties' bargain, it has shown reliance. Further, as to the issue of reliance on a warranty, a buyer's actual or constructive knowledge of facts inconsistent with the warranty may be immaterial. A buyer's knowledge may, however, become relevant when considering waiver. But here as well, New York law provides its own standard, which hinges upon both the nature and the source of a buyer's knowledge. The New York standard requires that the knowledge supporting a waiver must have been provided by the seller itself, and the disclosure must be to a degree adequate for the buyer to have full knowledge when completing the sale that the seller's warranty has been breached. Knowledge from independent sources is not material. In contrast, the inquiry into a buyer's reasonable reliance in the tort context examines the full scope of a buyer's actual or constructive knowledge from whatever source. On this particular record, those different lenses control the different outcome of the contract and tort claims.

## II. PROCEDURAL BACKGROUND

{6}     This action was filed in Wake County Superior Court on August 18, 2009, and subsequently designated a Complex Business Case.  Plaintiffs filed suit seeking to have the Court declare that Plaintiffs had complied with their obligations under a December 30, 2007 Asset Purchase Agreement ("APA") and, as a result, to declare they are entitled to the release of funds held in escrow.  Defendant denied Plaintiffs' material allegations and asserted multiple counterclaims, which include contract claims based on breach of representations and warranties contained in the APA; tort claims, including fraud, constructive fraud, fraudulent concealment, and negligent misrepresentation; and a statutory claim based on Chapter 75 of the North Carolina General Statutes.  The case now comes before the Court after extensive discovery on these claims.

{7}     On May 5, 2010, Plaintiffs filed a Motion for Partial Summary Judgment, seeking to declare that the warranty claims should be resolved under North Carolina law notwithstanding the New York choice of law provided by the APA.  By its August 11, 2010 order, the Court determined:

> [T]he contracting parties specifically negotiated for and agreed upon the choice of law provision that they included in their contract.  That provision provided that "rights of the parties and all Actions . . . will be governed by and construed in accordance with the domestic substantive laws of the State of New York."  This Court will honor that provision, and the unambiguous intent of the parties, and apply New York law to the contract.  The parties agreed upon the choice of law before negotiating the terms of the final agreement, thus creating potential prejudice to a party relying on that choice in drafting the final agreement.

While emphasizing the significance of the parties' chosen agreement to contract claims, that Order did not by its terms expressly determine whether the tort and statutory claims would be likewise decided under New York law.

{8}     On October 29, 2010, Defendant filed its Motion for Partial Summary Judgment, seeking a ruling in its favor on Plaintiffs' liability.  Defendant's accompanying memorandum address warranty claims under New York law, but analyzes the tort and statutory claims under North Carolina law.  On December 3, 2010, Plaintiffs filed their Motion for Summary Judgment.  These motions were fully briefed, and the Court has heard oral argument and received the submitted portions of the factual record.

{9}     On February 24, 2011, Defendant also filed a motion to modify the Case Management Order to set a trial date.  The Court has deferred consideration of that motion pending its consideration of the cross-motions for summary judgment, and will set a status conference to consider further.

## III.  FACTUAL BACKGROUND

A.   The Parties and Negotiations Leading to the Asset Purchase Agreement[1]

{10}    The contract at issue provides for the sale of assets in an ongoing business operating in Zebulon, North Carolina.  Plaintiff KLATMW, Inc. ("KLATMW") is a corporation incorporated under the laws of the State of Nevada.   It formerly conducted business in Zebulon, North Carolina as Electronic Service Protection Inc. ("ESP-S").  KLATMW is the successor in interest to Power Quality Innovators, Inc. ("PQI").   Plaintiff KLATMW International ("KI") is a corporation incorporated

---

[1] The facts leading up to the parties' execution of a Letter of Intent are essentially undisputed and will be recited without specific reference to the record.  These facts come from pleadings and briefs which do contain annotations to the record.  The execution of the APA is not disputed, although the parties have significantly different positions on what Sellers knew and what they intended to disclose or what they should have disclosed in two schedules referencing facts regarding the customer Global Information Services.  The Court will attempt to refer to specific portions of the record when addressing positions which the Court believes create material fact issues.  The Court does not, however, intend this Order and Opinion be read as reciting every material fact that may be relevant to further proceedings.

under the laws of the State of Nevada, which formerly conducted business in Zebulon, North Carolina as Electronic Systems Protection International ("ESP-I"). The companies were equally owned by Plaintiffs Kim Alfreds ("Alfreds") and Tom Weickardt ("Weickardt"), both designated as "Owner" in the APA. Neither Alfreds nor Weickardt is a North Carolina citizen or resident.

{11} Defendant Electronic Systems Protection, Inc. ("ESP") is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Zebulon, North Carolina. ESP was formed to acquire the assets as provided by the APA, and it continued the existing business after the acquisition.

{12} ESP designs, manufactures, and sells power protection devices used primarily to control power surges and to provide power filtration in high volume office equipment. Prior to the sale, ESP was jointly owned by Alfreds and Weickardt as 50/50 shareholders. During 2007, a three-person management team oversaw the company's daily operations. Stephen Cole ("Cole") was its President; David J. Perrotta ("Perrotta") was the Vice President of Operations; and David D'Agostino ("D'Agostino") was the Vice President of Sales. During this time, Alfreds and Weickardt were off-site owners who maintained regular contact with the management team. Global Information Services, Inc. ("Global") is a parent corporation of multiple autonomous office dealers located across the United States. Until 2007, Global dealers primarily sold or leased office equipment manufactured by Japanese office equipment manufacturers such as Canon and Ricoh, and included ESP power filters as a part of the initial sale and installation. At least up to April 2007, Global included ESP power protection devices on an estimated 90% of Global products. In April 2007, in a widely known acquisition, Xerox bought Global for over $1 billion. Global had not earlier sold Xerox equipment, and Xerox was neither an ESP customer nor used power filtration equipment on a proactive basis, although ESP products may have been listed on Xerox price lists.

{13}     Alfreds and Weickardt decided in Summer 2007 to sell the company. Plaintiffs approached Thomas Ledford ("Ledford") of the investment banking firm The Lenox Group ("Lenox") to assist with the sale. The initial target was a purchase price which would provide the owners a net of $50 million after taxes and expenses. Ledford prepared an Investment Opportunity Overview in October 2007.[2] (*See* Pls.' Dep. Ex. 56: ESP Investment Opportunity Overview.)

{14}     Gridiron Capital, LLC ("Gridiron"), is a private equity firm represented by Tom Burger ("Burger") and Geoff Spillane ("Spillane"). Gridiron obtained the Lenox overview and was one of only two bidders selected to make final presentations to Plaintiffs' management team. Gridiron knew that ESP had for some time been seeking to develop a substantial relationship with Xerox. In its presentation, Burger emphasized Gridiron's relationship with a former business executive of Xerox that could potentially help develop that business relationship. Cole, Perrotta, and D'Agostino expressed their unanimous preference for Gridiron to Alfreds and Weickardt, who in turn deferred to their recommendations. Gridiron submitted its final Letter of Intent ("LOI") on November 5, 2007, reflecting a purchase price of $82 million. Electronic Systems Protection, Inc., a Delaware corporation, identified as the "Buyer" in the APA, was formed to complete the acquisition. The former ESP changed its name.

B. The Relevant Provisions of the Asset Purchase Agreement

{15}     The Court sets out each of the relevant provisions of the APA before discussing them in the context of the various claims.

---

[2] The parties' evidentiary submission included multiple deposition exhibits as well as other material. The Court is not aware of any challenge to the authenticity of any of the documentary materials submitted by any party.

{16}   The parties executed the APA dated December 30, 2007.  The closing occurred on January 8, 2008 ("Closing" or "Closing Date").  Sellers and Buyer were at all relevant times sophisticated business entities represented by legal counsel.

{17}   The  APA recites that the purchase was being made "in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants" contained in the APA.   That is, the warranties were a part of the consideration for the sale and purchase.  They were a "basis of the bargain."

{18}   Two APA sections control Defendant's claim that Plaintiffs failed to disclose and deliver a prior settlement agreement that included a provision related to confidentiality.  The same section provides for the escrow account.  Those sections provide in relevant part:

> **2.4.   Closing Deliveries**.  The parties shall take the actions set forth in Section 2.4 at the Closing.
>
> (a)  The Buyer will deliver (i) to the Escrow Agent, $2,050,000.00 by wire transfer of immediately available federal funds to the account designated in the Escrow Agreement for purposes of satisfying amounts owed (if any) to the Buyer Indemnified Parties pursuant to Section 10.1."
>
> . . . .
>
> (g)  Subject to the provisions of Section 6.15, the Selling Companies and the Owners shall deliver to the Buyer substantially all books and records relating to the Business which are included in the Acquired Assets and shall cause any such books and records not delivered at Closing to be delivered as promptly thereafter as reasonable practicable.
>
> **3.16.1 Contracts.**  Except as disclosed on Schedule 3.16, no Selling Company is bound by or a party to:
>
> (g)  any Contractual Obligation . . .  which (i) relates to confidentiality (other than custom confidentiality provisions contained is customer

and supplier agreements of the Selling Companies entered into in the Ordinary Course of Business) or (ii) limits or purports to limit the ability of any Person to compete in any line of business, with any Person in any geographical area;

{19} Two APA sections control Defendant's claims related to changes affecting Global. A schedule accompanies each section. Definitions of material terms were provided in Exhibit A to the APA. The sections and relevant definition are:

> 3.7. __Absence of Certain Developments__. Since the Most Recent Balance Sheet Date and through the Closing Date, the Business has been and will be conducted in the Ordinary Course of Business and, except for matters disclosed on __Schedule 3.7__ (which matters do not constitute a Material Adverse Effect)[3]:
>
> (l) no event or circumstance has occurred which constitutes a Material Adverse Effect.

The term "Material Adverse Effect" is defined as:

> "__Material Adverse Effect__" means any change or effect that is, or could reasonably be expected to be, materially adverse to the Business, Assets, Liabilities, Financial Condition or Results of Operation of the Selling Companies, taken as a whole . . . (APA A-6)[4]

---

[3] Note in particular the ending parenthetical, which effectively states that any matter disclosed in an accompanying schedule is not itself a Material Adverse Effect. Plaintiffs' briefs describe Section 3.7 as requiring Sellers to disclose any Material Adverse Effect. At oral argument, Sellers' counsel described Schedule 3.7 as being a disclosure of a Material Adverse Effect because of changes affecting Global. But, strictly applied, the parenthetical forecloses this assertion because it says that matters in the accompanying schedule are warranted __not__ to be a Material Adverse Effect. The Court questions whether this was the parties' actual intent, as it would be more typical to structure asset purchase agreements to use schedules to except items from a warranty. Note that this same parenthetical language is not included in the warranty of Section 3.18, for which Sellers included identical language in the accompanying schedule.

[4] The question arises as to whether the "reasonable expectation" provides a subjective standard or an objective standard. As discussed below, the Court concludes that the New York courts would impose an objective standard which looks at what facts are known generally rather than a subjective standard that looks only to what Sellers knew.

Plaintiffs provided the following schedule:

> **Schedule 3.7(l)** <u>**Absence of Certain Developments.**</u> The anticipated sales volume of Global Imaging Systems (GISX) appears to be diminishing due to their acquisition by Xerox in April, 2007. Prior to mid 2007, ESP did not have a relationship with Xerox and given Xerox's absence of a policy to include power protection on a proactive basis, a decline in sales was anticipated. At this time ESP cannot measure the impact of this transaction of [sic] future sales.[5]

Plaintiffs' counsel submitted a slide presentation at oral argument which cites to an e-mail dated December 16, 2007, two weeks before the date of the APA, which apparently was a disclosure identical or similar to the language in Schedule 3.7.[6]

APA Section 3.18 is specifically in reference to customers. It provides in relevant part:

> **3.18.** <u>**Customers and Suppliers**</u>. Except as set forth on <u>Schedule 3.18</u> (i) . . . none of the customers . . . required to be listed on <u>Schedule 3.18</u> has cancelled, terminated or otherwise materially altered (including any material reduction in the rate or amount of sales or purchases or material increase in the prices charged or paid, as the case may be) or notified the Business of any intention to do any of the foregoing or otherwise threatened in writing to cancel, terminate or materially alter (including material reduction in the rate or amount of sales or purchases, as the case may be) its relationship with the Business.

---

[5] The parties agreed that Sellers were not making warranties as to the actual future sales of any customer. APA Section 6.18.

[6] The presentation refers to "Exhibit 22," which the Court could not locate in the appendices submitted with the motions for summary judgment. Defendant has urged the Court to consider that Sellers controlled when Buyer would have access to Sellers' customer base for due diligence and only allowed that access after the APA was signed, noting that the APA was signed on December 30 and the deal closed on January 8, 2008. The Court has considered this, but has also considered APA section 2.3, which indicated that closing would be after the conditions of Section 7 were satisfied, and APA Section 7.13, which conditioned the closing on the completion of Buyer's due diligence, determined in Buyer's sole discretion.

Sellers provided the following schedule:

> **Schedule 3.18**.  The anticipated sales volume from Global Imaging Systems (GISX) appears to be diminishing due to their acquisition by Xerox in April, 2007.  Prior to mid 2007, ESP did not have a relationship with Xerox and given Xerox's absence of a policy to include power protection on a proactive basis, a decline in sales was anticipated.  At this time, ESP cannot measure the impact of this transaction of [sic] future sales.

{20}    Sellers separately warranted the accuracy of statements included in documents furnished the Buyer, as follows:

> **3.25 Disclosure**.  The representations and warranties contained in this Section 3 and in the documents, instruments and certificates delivered to the Buyer by the Selling Companies pursuant to this Agreement do not contain and will not contain any untrue statement of fact or omit to state any material fact necessary in order to make the statements and information contained therein not misleading.

{21}    Defendant contends that the statements contained in Schedule 3.7 and Schedule 3.18 were both inaccurate and misleading, so that the changes affecting Global resulted in a breach of warranties in Sections 3.7, 3.18, and 3.25.

{22}    Section 10.1.1 of the APA provides for indemnity; Section 10.1.2 provides monetary limitations for the indemnity.  These sections refer to both contract and tort claims.  Section 10.1.1 provides in relevant part that Sellers:

> jointly and severally . . . indemnify and hold harmless the Buyer, . . . from, and against and in respect of any and all Actions, Liabilities, . . . losses, damages, bonds, dues, assessments, fines, penalties, Taxes, fees, costs (including costs of investigation, defense, and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorney's fees and expert fees and expenses), . . . arising out of or indirectly related to:

(a)  any fraud of any of the Selling Companies or Owners or any breach of, or inaccuracy in, any representation or warranty made by the Selling Companies . . . in this Agreement . . . or in any document, Schedule . . . delivered pursuant to this Agreement (in each case, as such representation or warranty would read if all qualifications as to materiality, including each reference to the term "Material Adverse Effect," were deleted therefrom);

(b)  any breach or violation of any covenant or agreement of the Selling Companies (including under this Section 10) in or pursuant to this Agreement;

. . . .

(f)  any breach or violation of any covenant or agreement of such Owner (including under this Section 10) in or pursuant to this Agreement.

Section 10.1.2 provides in relevant part:

**10.1.2.  Monetary Limitations**.  The Owners and Selling Companies will have no obligation to indemnify the Buyer Indemnified Person pursuant to Sections 10.1.1(a) and 10.1.1(e) in respect of Losses arising from the breach of, or inaccuracy in, any representation or warranty unless the aggregate amount of all such Losses incurred or suffered by the Buyer Indemnified Persons exceeds $100,000 (at which point the Owners and Selling Companies will indemnify the Buyer Indemnified Persons for all such Losses) . . . and the Owners' and Selling Companies' aggregate liability in respect to claims for breach of, or inaccuracy in, any representation or warranty pursuant to Sections 10.1.1(a) and 10.1.1(e) will not exceed $8,200,000 . . . provided, however, that . . . the Indemnity Cap will not apply to . . .  claims based upon fraud or intentional misrepresentation.

{23}  APA Section 12.4 of the APA contains the parties' choice-of-law provision and provides:

**Governing Law**.  This Agreement, the rights of the parties and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed in accordance with the domestic substantive laws of the State of New York, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

The definition of "Action" is significant in determining the law to be applied. It is:

> **"Action"** means any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation (whether at law or in equity, whether civil or criminal), controversy . . . .

## C.    Facts Regarding the Impact of Global's Acquisition by Xerox

{24}    The impact of the Xerox April 2007 acquisition of Global as of the Closing Date is the heart of Defendant's warranty claims under APA sections 3.7, 3.18, and 3.25. The fraud claims assert that Plaintiffs concealed those facts and induced Defendant to forego further investigation of the true facts known to Plaintiffs but unknown to Defendant. In sum, the parties appear to be in substantial agreement on the facts up to the signing of the Letter of Intent on November 5, 2007 and perhaps further extending to the middle of November, but they have very different positions both as to the facts occurring after mid-November and the relevance of those facts. There is a specific disagreement whether Plaintiffs became aware prior to the Closing Date of an internal Global directive, which Defendant asserts was a clear directive to make no purchase of ESP products for use with Xerox installations. They also differ as to the relevance of this fact. The Court believes that, in part, each side argues a bit more than allowed for under New York law. Plaintiffs urge that the warranty claims must be resolved on the basis of what Sellers themselves did or did not know at the Closing Date, and that doing so is dispositive because they contend the record is clear that they did not know of the internal Global directive which was first disclosed to them after the Closing Date. The Court believes that Plaintiffs' limitation of the inquiry to what they actually knew at the Closing Date is not determinative under the controlling New York standard. On the other hand, Defendant contends that the waiver issue must be resolved in its favor because the New York standard requires that Defendant have "full knowledge," and then appears to contend that "full knowledge" means Plaintiffs must have disclosed to Defendant every fact of which Plaintiffs were aware. While the New York waiver standard does require that Plaintiffs told

Defendant enough to provide full knowledge that Plaintiffs' warranties were breached, such knowledge need not necessarily be fully coterminous with Plaintiffs' knowledge.

{25}   Shortly after the April 2007 Xerox acquisition, Alfred Vieira ("Vieira"), Global's Vice President of Operations, called Alfreds and told him that business will continue "as usual."  (Dep. of Alfred Vieira, June 7, 2010 ("Vieira Dep."), 7:5–16, 7:23–8:2.)  Perrotta testified that ESP viewed the Xerox acquisition "as an opportunity to get to increase the business by having Xerox on board with Global dealers."  (Dep. of David J. Perrotta, April 14, 2010 ("Perrotta Dep."), 82:11–12.)  ESP and Cole had been making attempts to develop a business relationship with Xerox since 2005 or 2006.  (Dep. of Stephen Cole ("Cole Dep."), 75:19–21.)  Cole testified that he was working with ESP's sales staff to convert Global from a "service" to a "sales" based approach.  (Cole Dep. 18:6–9, 75:19–21).[7]

{26}   The motions and briefs do not suggest that the Xerox acquisition was the motivation for Alfreds and Weickardt placing ESP up for sale in Summer 2007.  It is clear that the Xerox acquisition did, however, at some point begin to have some impact on the ESP/Global relationship, including at least having individual Global dealers ask Global management questions about the impact.  The record suggests that potential changes as a result of the acquisition first became the subject of significant management attention in October 2007, triggered in part by questions asked by dealers at the October 2007 annual dealers' meeting.   Questions by Global dealers and "rumors" picked up from them by ESP sales representatives led to independent analysis by the management teams of both Global and ESP.

{27}   Shortly after the Xerox acquisition, Global changed its lead contact with ESP when  Robert Corkern ("Corkern") became Global's new Director of Services.  (Dep.

---

[7] There is conflicting testimony whether Cole had a legitimate basis to hold onto such hope as of the Closing Date.

of Paul Schulman August 9, 2010 ("Shulman Dep."), 10:6–8.) Corkern was responsible for the fiscal performance of the Global dealers' service departments and also served as the liaison between Xerox and the Global service departments. (Dep. of Robert Corkern, June 7, 2010 ("Corkern Dep."), 15:13–25.) Prior to the acquisition, Global did not sell Xerox machines. After the acquisition, neither Xerox nor Global directed the Global dealers to sell a specific quota of Xerox machines. (Corkern Dep. 64:2–6; Schulman Dep. 31:3–8.) But, because Xerox had not historically used power protection proactively, when Xerox acquired Global, dealers were unsure about the use of ESP power protection devices on Xerox equipment. (Corkern Dep. 19:13–18.) During the October 2007 Global dealers' meeting in Dallas, Texas, Corkern was asked by one of the Global dealer's president if Xerox would use power protection on its equipment. He indicated he would have to investigate. (Corkern Dep. 19:13–18.) Corkern then reached out to Mike Romeo ("Romeo"), his "counterpart inside of Xerox." (Corkern Dep. 19:25–22:3.) Corkern explained that he learned that Xerox had not historically used power protection equipment, but that there may be some opportunity. Corkern and Romeo discussed doing further due diligence to address such an opportunity. Corkern then received a directive from his management to simply follow Xerox's directive. Corkern indicated that he then generally advised the Global dealers not to use power protection equipment for Xerox installations but to continue to use it on installations of Japanese equipment. (Corkern Dep. 20:11–22:3.) The record suggests that Corkern may not have been quite as direct in his communications with Cole, at least not until later.

{28}  Throughout October and November, ESP, and particularly Cole, pressed for some directive regarding Xerox installations, but Global did not provide ESP with a specific directive. ESP field representatives began to hear "rumors" from service personnel at certain Global dealers. (Pls.' Legal Mem. in Supp. of Their Mot. for Summ. J. and Resp. to Def.'s Mot. for Summ. J. 6.) ESP account managers reported the rumors to ESP's Cole. (*See, e.g.,* Def.'s Dep. Ex. 29) Cole in turn communicated

with Corkern. Corkern advised Cole that Global was assessing "the future of Global using power protection on Xerox equipment." The conversations did not extend to Japanese equipment. (Corkern Dep. 73:11–74:1.) As late as November 8, Corkern continued to evaluate whether there may be usage of ESP equipment with Xerox installations, and he advised at least one Global dealer that it was "too early" to make a final recommendation. (Corkern Dep. 76:16–22.) As Corkern put it, as of November 8, 2007, he "didn't really have the answers." (Corkern Dep. 77:1–5.)

{29} There is some evidence, at least at some point, that there may have been personnel within Xerox that would have been receptive to Cole's goal of expanding a Xerox relationship. One Xerox personnel regarded ESP's proposed business plan as a "compelling business case." (Pls.' Ex. 91: E–mail from Roger Ellefson, Manger, Office Group Solutions Marketing, to Paul Schulman (Nov. 8, 2007, 0956).) There is, however, a dispute whether ESP and Cole were by the Closing Date fully aware that Cole's business plan had no realistic chance of succeeding and that Cole had no reasonable basis to say otherwise.

{30} The parties assert different conclusions on what Plaintiffs and Cole knew toward the end of November 2007. Corkern's deposition indicates there were several November conversations and in mid-November, Corkern indicated that "Global is re-evaluating power protection on Xerox products, but that the local Global dealers were free to operate as they see fit." (Corkern Dep. 83:17–24.) On the contrary, Defendant asserts that Cole knew that there would be a precipitous drop in Global sales as the Global dealers moved to more predominant Xerox based installations. In part, Defendant says that knowledge was evident in analyses that Cole himself authored (*See, e.g.*, Def.'s Dep. Ex. 36) and is further supported by what Schulman told Cole after mid-November, which Schulman indicated was specific that Xerox installations would not include ESP filters. (Schulman Dep. 64:17–23.)

{31}    Internal Global considerations appear to have reached some conclusion by November 21, 2007, at least as it relates to whether ESP power equipment would be sold proactively on Xerox installations.  Defendant's Deposition Exhibit 34 is a key document.  It is an internal Global e–mail dated November 21, 2007 from Corkern to all Global presidents to update "everyone as to where we are on Surge Protectors/Power Filters."  The body of the e–mail provides, in part:

> After continued research with Xerox, it is apparent that Xerox only uses Power Filters/Surge Protectors on a reactive basis, if they identify a problem.
>
> Xerox does not have a policy or a procedure to send Power Filters/Surge Protectors out on a pro-active basis.
>
> We should continue to "Rotate our stock" of existing Power Filters/Surge Protectors and use them on the Japanese manufactured products as we have in the past.  . . .
>
> Since Xerox is not using Power Protection/Surge Protection on a pro-active basis, we should follow suit on the Xerox products and handle it just as Xerox would, which is use them if the need is identified for the installation.  We are continuing dialog with Xerox and should anything change, we will communicate the information out to you immediately.
>
> There should be no reason for our companies to make huge investments in buying Power Protectors/Surge Protectors going forward.[8]

(Def.'s Dep. Ex. 34.)  Corkern testified that this e–mail reflects a clear instruction from Global executive management that Global should not buy ESP products for Xerox machines on a going–forward basis absent a specific particular need. (Corkern Dep. 105:23–106:11.)  Schulman testified that Global "at least instructed

---

[8]  Defendant is at times a bit loose in how it refers to this document, seeming to refer to it as a directive to cease all purchases of ESP products.  Plaintiffs note that the e–mail does not necessarily direct any change in terms of purchases of ESP products for installations using Japanese equipment. The Court does not believe this is a controlling issue, as there could clearly be a material impact on sales even if ESP products continued to be used on some equipment but not on Xerox equipment.

its presidents and dealers to stop their purchases of ESP products for Xerox machines before December 31, 2007." (Schulman Dep. 23:3–6.)

{32}    The Court noted no direct evidence that Cole received an actual copy of the e–mail.  There is a dispute whether he was aware of its contents.  In a November 28, 2007 e–mail, Corkern states that he:

> received a call from Steve Cole from ESP and he obviously was aware of the communication I sent out to Global Imaging Systems last week that I shared with you. . .  I know he is concerned because I believe he is thinking that there will be a loss of business going forward on the Xerox products.

(Def.'s Dep. Ex. 89.)  Cole himself denies that he learned of the e–mail or the final decision it purports to represent until after the Closing Date, at a January 18, 2008 meeting in Tampa.  (Cole Dep. 250:21–251:5.)

{33}    During this period, Plaintiffs were also performing their own evaluations, resulting in a series of documents which were not produced to Defendant prior to the Closing.  Defendant contends both that the documents should have been produced and that the non-disclosure documents prove that the disclosures which Plaintiffs did make are inaccurate and misleading.  To the contrary, Plaintiffs contend that they had no obligation to disclose and Defendant never asked for these documents, but that, in any event, the documents demonstrate the adequacy and accuracy of the representations in Schedule 3.7 and Schedule 3.18.

{34}    In December 2007, Cole and D'Agostino compiled a November 2007 ESP Sales Division Monthly Report in which they calculated current Global account losses totaling approximately $55,000.00 per month, based on sales losses for at least twelve global companies.  (Dep. of David D'Agostino April 15, 2010 ("D'Agostino Dep.") 85:22–86:12.)  Cole performed a business analysis utilizing a method referred to first as the "Harvard Review" and then as the "Zebulon Review." It was based on a model format known as the Harvard Business Review; Best

Practices; Service to Sales based Programs. (*See* Cole Dep. 18.) The study included an analysis of the company's current economic status as well as developing a program for moving forward with Global as a customer. Cole testified that the study was to assist his sales staff with converting to the "sales" based approach. (Cole Dep. 18:6–9.) Plaintiffs stress that the study was a business planning tool and not a document prepared specifically in connection with the sale of the company.

{35}   The analysis includes both a discussion of potential immediate lost sales and a business plan to recapture and increase those sales. (*See, e.g.*, Def's Dep. Ex. 37: Excerpt from Harvard Business Review.) Cole characterized the Xerox acquisition of Global as an "enormous sales based opportunity," but also stated:

> . . . ESP . . . was sure that despite claims from Xerox Corporate, ESP's future with Global was at risk. . . . [I]t was clear that eventually all locations would be offering exclusively Xerox products.
>
> The current projection is that 50%+ of the $2M in ESP revenue from Global Sales will degrade in the next year as Global is morphed into the Xerox culture and organization.

(Def's Dep. Ex. 37: Excerpt from Harvard Business Review 4–5.) Cole's analysis underwent several drafts. On December 2, 2007, Cole circulated the Harvard Review to D'Agostino and Perrotta. (Def.'s Dep. Ex. 36.) In a December 4, 2007 e–mail, Cole circulated a revised draft to D'Agostino, Perrotta, and Naples. (Def.'s Dep. Ex. 37.) Cole re–titled the document "Zebulon Business Review," and revised the analysis regarding the anticipated loss of Global revenue to state "ESP management has forecasted that ESP will lose [$700K] to $ 1M of the $2M in sales revenue from GIS-X [Global] in the short term." (Def.'s Dep. Ex. 39: Zebulon Business Review 4–5.) Cole testified that the "$700K" was close to the $58,000 monthly sales reduction estimated by D'Agostino on November 27, 2007. (Cole Dep. 76:26–77:16, 82:17–83:5.)

{36}    Plaintiffs made a considered determination not to share the Cole analysis with Defendant, but rather utilized the analysis to make the disclosures of Schedule 3.7 and Schedule 3.18.  The language of those schedules is essentially taken verbatim from the last draft of the Zebulon Review.  On December 5, 2007, Cole, Alfreds, and Ledford held a conference call to discuss the Zebulon Business Review.  (Dep. of Thomas Ledford August 3, 2010 ("Ledford Dep.") 116:23–118:19.)  On December 7, 2007, at Alfreds' direction, Cole circulated a third version of his analysis which replaced the specific lost sales projections with language stating: "At this time, ESP management cannot measure the impact of these events on future sales."  (D'Agostino Dep. 75:8–24; Perrota Dep. 103:21–25; Pls.' Legal Mem. in Supp. of Their Mot. for Summ. J. and Resp. to Def.'s Mot. for Summ. J. 9, 10.)  This language is obviously the basis of the disclosure in the APA schedules.

{37}    Defendant retained The Lucas Group ("TLG"), a business acquisition services company, to assist it with due diligence in this case.  (Dep. of Chris Sekula, June 16, 2010 ("Sekula Dep."), 18:8.)  As TLG's lead advisor, Chris Sekula ("Sekula") testified that due diligence is critical for a buyer because a buyer must "independently verify information about the company" being acquired.  Cole indicates that throughout the due diligence process, he had conversations with Defendant's representatives about the drop in Global sales and how ESP was addressing the reduction by converting from a "service" to a "sales" based approach.  (Cole Dep. 84:6–9, 257:17–258:5.)  TLG learned directly from dealers of conflicting reports about whether Xerox used power protection devices.  (Sekula Dep. 60:1–15.)   Defendant indicates that it was not allowed to contact customers until the APA was signed on December 30, 2007, after which TLG surveyed several ESP customers including a number of Global dealers.  (Sekula Dep. 37:8–10.)  At the direction of Plaintiffs, TLG contacted seven Global dealers, three of which indicated that Xerox was pressuring them to terminate the use of ESP products.  Two dealers mentioned Xerox, but stated that Xerox was not expected to affect the purchase of ESP products, and the remaining two dealers

made no mention of Xerox to Defendant's due diligence team. (Dep. of Geoffrey D. Spillane ("Spillane Dep.") 33:6–8; Cole Dep. 372:18–373:12.) During these interviews, TLG represented to the Global Dealers that it was working for the Sellers. (Spillane Dep. 45:14–15.)

{38}  Due to the "confusing messages" TLG received from Global dealers about the future level of business it expected to conduct with ESP, TLG prepared a special Global Report. (Sekula Dep. 60:1–15.) Sekula stated that he did not have a clear picture about what Global's future business relationship with ESP would be, and he had doubts about whether there was any directive instructing Global dealers to halt purchasing of ESP product. (Sekula Dep. 103:11–16, 106:4–6.) Nevertheless, TLG projected a drop in annual Global sales revenue of at least $300,000.00, an amount that The Lenox Group's Burger believed was material. (Dep. of Tom Burger ("Burger Dep.") 108:20–109:3; *See* Pls.' Ex. 42: Lucus Group Report, "Electronic Systems Protection" (Dec. 11, 2007).) The Court understands that Defendant did not share the TLG due diligence report with Plaintiffs.

{39}  Defendant places much emphasis on comments made by Cole after TLG completed its due diligence and contends that Cole provided assurances that led Defendant to choose to limit information which it, in turn, decided to provide to Defendant's lenders. Defendant telephoned Cole to ask him about the conflicting information that had been reported by TLG. Burger testified that Cole told him "not to worry about it, that clearly these guys are small local dealers and they didn't understand what was going on." (Burger Dep. 89:20–90:1; Spillane Dep. 33:6–34:11.) Burger indicates that Cole further asked TLG not to contact Global to ask for more information about its relationship with ESP, stating that doing so would send up a "red–flag." (Burger Dep. 75:10.) Cole explained that this would send up a red flag because ESP was having conversations about growing its business relationship with Global and "they were having some issues because of just not knowing what was going on with the whole Xerox acquisition." (Burger Dep. 75:13–

16.)  Neither Defendant nor TLG request any additional follow-up information from the Plaintiffs regarding Xerox or Global.  (Spillane Dep. 35:22–36:1.)  Spillane stated that  "[w]e relied on Steve Cole as the ongoing president of the business and someone who was investing a lot of his wealth in the business."  (Spillane Dep. 42:22–25.)  Defendant claims that Cole purposely misled Defendant in order to assure that the transaction closed.  The Court is not aware that Cole was ever asked specifically whether he had attempted to quantify potential lost Global sales.

{40}    In a January 4, 2008 e–mail, Spillane advised Sekula of TLG to leave the Xerox/Global interviews out of the final Lucas Report.  (Pls.' Ex. 17: E–mail from Geoffrey Spillane to Chris Sekula (Jan. 4, 2008, 0956).)  Defendant indicates that around this time Cole told Defendant that he had a productive meeting with Global, and that Cole's statement was a factor in deleting negative references in the final due diligence report.  On January 6, 2008 Geoff Spillane directed Chris Sekula to:

> leave out the negative Global Imaging interviews concerning the so-called Xerox directive.  ESP is currently in the Xerox price list and had a meeting on the 18th with them to continue the process to roll out the full marketing program.  Management has doubts about any sort of directive and suspect some of the dealers may be misinformed.
>
> The Lucas report and one final item from our accounting firm are the only remaining due diligence items for the banks to get their final approval on Monday so we can close.

(Pls.' Ex. 16.)

Defendant claims that Cole's statement regarding a favorable December meeting is an outright falsehood and that the meeting did not actually occur until January 18, 2008 with an unfavorable result.   This January 18, 2008 meeting in Tampa is the one at which Plaintiffs indicate they learned for the first time about the directive reflected in Exhibit 34, Corkern's November 21, 2007 e–mail to Global dealers.

{41}   The final Lucas Group Report was then presented to the Defendant's lenders shortly prior to the Closing Date.  The Customer Survey section did not contain any information regarding the negative Global customer calls due to the "confusing story."  (Pls.' Ex. 42: Lucus Group Report, "Electronic Systems Protection" (Dec. 11, 2007) 36–41; Sekula Dep. 108:2.)  The final Lucas Report also stated that "Xerox Has Been a Recent Partnership Addition for ESP," boasting that "Xerox Selected ESP After Extensive Product Testing."  (Pls.' Ex. 42: Lucus Group Report, "Electronic Systems Protection" (Dec. 11, 2007) 30.)  On a Closing Day conference call, one of Defendant's lenders asked how the Global/Xerox acquisition had affected ESP's relationship with Global.  (Spillane Dep. 29:10–13.)  According to Spillane, Cole told the lender that, in Cole's opinion, the relationship with ESP and Global was strong and the Xerox acquisition was not going to impact the business, (Spillane Dep. 31:17–32:19), and further stated that the Xerox acquisition was a huge opportunity for ESP, and ESP's business should be expected to improve. (Burger Dep. 103:3–19; Cole Dep. 402:23–403:4.)  Cole did acknowledge the recent decrease in sales and told the lenders that he and ESP "had a plan to build [the Global business] back up and actually increase it."  (Cole Dep. 421:3–13.)  Defendant claims that Cole's remarks were false and intended to induce Defendant to close the transaction without further due diligence.  It appears that Defendant accepted Cole's assurances and did not make direct inquiry of Global management.

{42}   Defendant closed the transaction.  It did not seek any APA amendment to reflect the confusing story regarding Global dealers or to preserve claims based on a loss of Global sales.  In fact, the APA included an assurance in Section 6.18 that Defendant was not relying on a projection of future sales, and Section 7.13 provided that Defendant had completed due diligence to its satisfaction.

{43}   On January 18, 2008, ten days after the Closing Date,  Cole, Perrotta, and D'Agostino met with Schulman, Corkern, and Romeo in the Tampa airport.  (Cole Dep. 158:16–159:21.)  Cole stated that this meeting did not go "that well," and that

Schulman indicated his recommendation that Global no longer purchase power protection devices for use on Xerox equipment. (Cole Dep. 158:16–159:21.) As noted, Schulman contends Cole was aware of this before the Closing Date.

{44} Cole, D'Agostino and Perrotta joined Defendant's management team after the acquisition. Cole is no longer employed. D'Agostino and Perrotta remain as a part of management. D'Agostino and Perrotta both testified that they believed that the disclosures in Schedule 3.7 and Schedule 3.18 were accurate as of the Closing Date.[9] (Perrotta Dep. 103:21–104:3; D'Agostino Dep. 62:11–63:12, 75:8–24.)

{45} Even after the Tampa meeting, Cole purported to be hopeful that the business relationship with Global could be salvaged with continuing marketing efforts. (Burger Dep. 40:23–41:9, 46:20–47:2, 49:10–16.) Defendant urges that Cole's assurances must be discounted, as he had negotiated a $1.069 Million bonus payment from Alfreds and Weickardt which depended on the transaction closing. (*See* Cole Dep. 142:5–9; 387:5–7.)

{46} Global sales dropped from $2,300,000.00 in 2007 to $130,000 in 2008.

{47} Cole ultimately resigned from Defendant's employ in January 2009 following a dispute over payment for a club membership and an overall loss of confidence. (Def.'s Mem. in Supp. of Mot. for Partial Summ. J. 16.)

---

[9] Plaintiffs urge that this testimony is a binding judicial admission by Defendant because the witnesses were a part of Defendant's management at the time of the testimony. Defendant contends that there can be no binding judicial admission because the provision of Rule of Evidence 802 provides that the testimony, if it qualifies as an admission, only becomes admissible as an exception to the hearsay rule, and that, in any event, Rule 802 does not apply because the testimony relates to beliefs at a time when the deponents were a part of Sellers' management, not Defendant's management. The Court does not believe the testimony rises to the level of a binding judicial admission that in of itself leads to summary judgment for Plaintiffs. The finder of fact could potentially find the evidence persuasive on the points reserved for trial.

{48}    Defendant submitted its "Indemnification Letter," dated July 1, 2009, alleging that Plaintiffs' failure to disclose the Harvard Review and/or the Zebulon Review during due diligence constitutes a violation of Sections 3.7, 3.16, and 3.25 of the APA.  (Compl.  ¶ 9.)  Plaintiffs denied Defendant's claim by letter dated July 12, 2009.  (Compl. ¶ 10.)

D.  Defendant's Settlement Agreement Claim

{49}    In May 2009, Defendant was sued by a competitor claiming that it had violated a Settlement Agreement ("Settlement Agreement") entered several years before between ESP and iESP, a predecessor of Smart Power, by which iESP was required to issue a Retraction letter to "its current independent sales representatives" and "to those entities or persons who are listed in Exhibit B, which includes those whom it reasonably believes received the "Technical Update," dated September 9, 1998."  As a condition of the Settlement Agreement, ESP agreed that it would not "mention, discuss or disseminate copies of or information about the Retraction, except in response to unsolicited inquiries or requests from others seeking additional information about the Update or the Retraction."[10]

{50}    Defendant contends that at the time of Closing it was completely unaware of the Settlement Agreement.  (Burger Dep. 55:16–20.)  On December 8, 2008, ESP disseminated a letter referencing the retraction letter issued by iESP as provided by the Settlement Agreement.  (*See* Compl., Ex. C.)  In pertinent part, the letter read:

> It has been brought to our attention that one of our competitors, SmartPower Systems, has published claims about our products that are both inaccurate and untrue.

---

[10]  The Settlement Agreement was attached to the Complaint as a part of the Supply Power Systems lawsuit attachments.  Exhibit B to the Settlement Agreement contains a list of twenty-seven (27) independent sales representatives who were required to receive the Retraction letter under the ESP/iESP SA.

It should be noted that SmartPower has a history of this type of activity.  Several years ago, the owner of SmartPower was forced to print a retraction letter regarding the false and inaccurate statements made about ESP products.

(*See* Compl., Ex. C.)

On June 4, 2009, Smart Power Systems, Inc. filed suit against Defendant in the United States District Court for the Middle District of Texas, alleging six causes of action: (1) false advertising and violation of 15 U.S.C. § 1125(a) (the Lanham Act); (2) breach of the ESP/iESP SA arising out of ESP's December 8, 2008 publication; (3) common law unfair competition under Texas law; (4) injurious falsehood under Texas law; (5) declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202; and (6) unjust enrichment under Texas law.  (Compl., Ex. C.)

{51}    Defendant claimed in its July 1, 2009 Indemnification Letter that Plaintiffs breached its representations and warranties in the APA by failing to disclose the existence of the ESP/iESP SA.  Defendant alleged that it incurred $88,256.00 in legal fees and $4,553.41 in costs before successfully mediating the claim on May 6, 2010.  Plaintiffs' July 12, 2009, response denied any obligation to indemnify.

## IV.  LEGAL STANDARD

{52}    Summary Judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. R. Civ. P. 56(c).  "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense."  *Lowe v. Bradford*, 305 N.C. 366, 368, 289 S.E.2d 363, 366 (1982) (internal citation omitted).  "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist."  N.C. R. Civ. P. 56, comment.  The burden

of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co. Inc.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Courts must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

## V. CHOICE OF LAW

{53} The APA contains a choice of law provision which requires the application of the substantive law of New York to "all actions" whether in contract, tort or otherwise. (APA § 12.4.) Under New York law, the interpretation of an unambiguous written contract is a question of law for the court, and words used in the contract should be given their plain meaning. *Nat'l Granite Title Ins. Agency, Inc., v. Cadlerock Properties Joint Venture, L.P.*, 773 N.Y.S.2d 86, 87 (N.Y. App. Div. 2004); *DDS Partners, LLC v. Celenza*, 775 N.Y.S.2d 319, 321 (N.Y. App. Div. 2004). The language of the APA conflicts of law provision is clear and not ambiguous.

{54} The Court earlier held that the conflict of law provision of the APA mandates that New York law be applied to the contract claims. The Court now concludes that New York law likewise controls the non-contractual claims. In addition to the definition of "Action" to include all claims "whether in contract or tort or otherwise," the APA's indemnity provisions expressly contemplate and provide for actions based on fraud. (APA Sections 10.1.1 and 10.1.2.) The Court perceives no North Carolina public policy that would reject the parties' consensual choice of law.

{55} The parties also provided that the venue for claims would be the North Carolina courts. The Court does not believe the choice of law provision is overridden by the venue selection. This Court can resolve the claims applying New York law.

{56} The Court's choice of law is not determinative as to the tort claims, for the law controlling those claims appears to be the same in New York and North Carolina. The choice of law is significant to the warranty claims. There is no reasonable argument that New York law should not govern the contract claims. The more significant new issue from a conflicts of law perspective is whether Defendant has the right to pursue a statutory claim under Chapter 75 of the North Carolina General Statutes. The Court's choice of New York law precludes such a claim. The Court believes, however, that North Carolina precedents in any event would preclude such a claim where, as here, the parties have provided for comprehensive remedies by their contract. Defendant should be confined to the chosen contract remedies.

## VI. DEFENDANT'S BREACH OF REPRESENTATION AND WARRANTY CLAIMS AS RELATE TO GLOBAL

{57} The parties' briefs and arguments address at length whether Defendant must demonstrate reasonable reliance as part of its warranty claims. Applying New York law, the Court concludes that the dispositive issue as to contract claims on this fact record is not reliance, but rather whether Defendant has waived its right to recover for any breach of warranty. The Court so concludes because it is clear that the warranties and representations at issue were a "basis of the bargain." Under the New York standard, this proves reliance. This proof of reliance, however, does not end the inquiry. Under New York law, a purchaser may waive its right to enforce a warranty on which it first relied if thereafter the purchaser receives information from its seller that the warranty is breached but closes the sale with full knowledge and acceptance of that breach. The standard does not mandate that the buyer

necessarily must have knowledge equal to the seller's knowledge. The New York standard is arguably harshly restrictive, in that it limits relevant evidence to facts known to the buyer solely by disclosures made by the seller. Information learned otherwise is immaterial to the waiver analysis. The record presents the issues whether the Section 3.7, 3.18, and 3.25 warranties were breached, giving rise to recovery under Section 10.1, and whether any such breach was waived. For reasons explained below, the Court concludes that the Section 3.7 warranty was breached, that the Section 3.18 warranty was not breached, and that there are material fact issues both as to whether the Section 3.25 warranty was breached and as to whether any breach which may be proved was waived.

{58}    Under New York law, a warranty is "an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2nd Cir. 1946) (J. Hand). Accordingly, "a warranty is not a promise of performance, but a statement of present fact." *First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292 (1st Dept 1999); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007); *MBIA Ins. Co. v. Countrywide Home Loans, Inc.*, 2009 NY Slip Op 31527U, at *9 (Sup. Ct. N.Y. 2009) ("warranties generally constitute statements of fact instead of intent"). An express warranty is part and parcel of the contract containing it and an action for its breach sounds "essentially in contract." *See CBS, Inc. v. Ziff-Davis Publ'g Co.*, 75 N.Y.2d 496, 503, 553 N.E.2d 997 (1990). In order to prevail on a breach warranty claim under New York law, a plaintiff must show that: "(1) the plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by the defendant." *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp.2d 628, 642 (S.D.N.Y. 1999). Even upon such proof, however, a buyer is barred from

recovery if he closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, unless the buyer preserves its right to enforce the terms of the contract after closing. *Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992).

{59}    Some discussion of how the reliance and waiver doctrines have evolved under New York law is instructive, and the evolution illuminates the significance of the nature and source of a buyer's knowledge. The discussion can begin with *CBS, Inc. v. Ziff-Davis Publ'g Co.* (hereinafter, "*Ziff-Davis*"), which has been recognized to make clear that a warranty claim sounds in contract rather than tort, and that contract principles rather than tort principles control the determination of reliance. CBS contracted to purchase assets based on financial information as to profitability. Ziff-Davis warranted in the asset purchase agreement that the financial data was true. Prior to closing, CBS doubted the accuracy of the financial information based on its own due diligence and so advised Ziff-Davis. Ziff-Davis dismissed the concerns and threatened CBS with damages should it refuse to close. The parties entered a supplemental agreement acknowledging their dispute and providing that the closing would not be a waiver of any claim to assert a violation of the financial covenant.[11] CBS later brought a claim for breach of that covenant. The lower court held that CBS was barred because it had not relied on the truth of the warranty. The Court of Appeals reversed and reinstated the warranty claim. In doing so, it accepted CBS's argument that the warranties were bargained for contractual terms that represented assurances that the facts were true. Noting earlier New York case law resolving that warranty claims sound in contract rather than in tort, the court stated that the "critical question is not whether the buyer believed in the truth of the warranted information . . . but whether it believed it was purchasing the seller's promise as to its truth." *Ziff-Davis*, 75 N.Y. 2d at 503, 533 N.E.2d at 1001 (citations

---

[11]  Whether a party includes such a reservation of claims becomes relevant in the context of waiver. Here, Defendant closed without seeking to amend the APA to provide such a reservation.

omitted). "Reliance" requires "no more than reliance on the express warranty as being a part of the bargain between the parties." *Id.* The court indicated that citations to tort cases involving reliance were simply inapposite. The right to recover on the warranty then requires "only on establishing that the warranty was breached." *Id.* at 504, 533 N.E.2d at 1001. Responding to the dissent, the majority summarized: "We do not hold that no reliance is required, but that the required reliance is established if, as here, the express warranties are bargained-for terms of the seller. *Id.* at 506, 533 N.E.2d at 1002.

{60} *Ziff-Davis* was followed by the decision of the Second Circuit in *Galli v. Metz*, 973 F.2d 145 (2d Cir. 1992), a case on which Plaintiffs heavily rely. *Galli* is not a reliance case; it is a waiver case. In New York, the contract doctrine of waiver bears similarity to the tort doctrine of reasonable reliance, but with one notable exception. The contract inquiry is limited to knowledge which comes from the seller; the tort inquiry examines all knowledge, both actual and constructive.

{61} In *Galli,* the parties entered a stock purchase agreement. The sellers granted warranties protecting against liabilities not disclosed on the financial statements. The deal closed six months after the last available financial statement. Substantial tax assessments were issued shortly after closing. The buyer suspended payment on promissory notes issued as a part of the sale consideration. The sellers instituted an action on the notes and the buyer counterclaimed for breach of warranty. The lower court ruled for the sellers after a bench trial. The Second Circuit reversed and remanded. Among other representations, the agreement warranted against claims, actions and investigations. Sellers urged that they did not breach this warranty, because they reasonably believed at the date of closing that a pre-closing threatened back-taxes assessment would not be forthcoming. The Second Circuit held that the warranty shifted the risk of an unknown assessment to the seller and that the seller's belief as to the truth of the warranty was "irrelevant." 973 F.2d at 148 (citations omitted). As to this claim, the Second

Circuit remanded to determine whether there were any damages associated with the breach. The Court also considered a separate claim of particular import to the decision at hand. Seller warranted against "any . . . claim . . . which might adversely affect the business . . ." 973 F.2d at 150. The record demonstrated that there was environmental contamination affecting the seller's property of which the buyer was aware prior to closing. Seller contended that no warranty was breached because the buyer knew of the contamination. Citing *Ziff-Davis*, Buyer instead contended that its knowledge was irrelevant because reliance is not an element of breach of warranty under New York law. The Court stated: "We agree with this general proposition, but nonetheless do not agree that it mandates a judgment for [buyer]." *Id.* The Court explained that:

> *Ziff-Davis* has far less force where the parties agree at closing that certain warranties are not accurate. Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights under the warranties (as CBS did in *Ziff-Davis*), we think the buyer has waived the breach.

*Id.*

{62}    The *Galli* court cautioned that a waiver finding depends on not only the extent of the buyer's knowledge, but also how the buyer gained its knowledge. If the source of the knowledge was the seller, there may be a strong case of waiver; on the other hand, if the information comes from common knowledge or a third-party, the possibility remains that the buyer purchased seller's warranty as insurance against future claims, even those which might be known by buyer. The Court rejected a defense based on a lack of reliance but held that a defense of waiver was not foreclosed by *Ziff-Davis*. Elucidating the distinction between the reliance and waiver issues, the *Galli* court noted that the district court had found a waiver because the seller advised buyer of the contamination. In that sense, the buyer

could not assert that its knowledge was irrelevant to the waiver defense. The court did accept the proposition that the seller's knowledge is irrelevant in determining whether in the first instance the warranty was relied on as a bargained for part of the agreement.

{63} *Galli* was followed by the Second Circuit opinion in *Rogath v. Siebenmann*, 129 F.3d 261 (2d Cir. 1997). The case arose from the sale of a painting that seller warranted was authentic and represented that he was aware of no challenge to its authenticity. The evidence indicated that the buyer was aware of questions about authenticity; however, it was unclear whether the source of his knowledge was from third parties or from the seller. The Court noted that the buyer had not expressly preserved rights under the document warranties "as required by *Galli*." 129 F.3d at 266. At the same time, pursuant to *Galli*, what a third-party told the buyer was "immaterial." *Id.* Rather, "[o]nly if the seller . . . himself . . . informed [buyer] of doubts about the provenance or challenges to authenticity will [buyer] be deemed to have waived any claims for breach of warranty . . ." *Id.* The Court remanded to resolve disputes as to what the buyer learned from the seller himself.

{64} The Southern District of New York then examined the line of precedent in its decision in *Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628 (S.D.N.Y. 1999). The case arose from the sale of a family owned waste business. The court held that it was "indisputable" that the defendants breached express warranties in the sales documentation. Acknowledging that the warranties were breached, defendants nevertheless argued that plaintiffs could not recover because they had not relied on the warranties. The court read *Ziff-Davis* to foreclose any argument based on reliance, and made tort considerations irrelevant. *See Promuto*, 44 F.Supp.2d at 643. Quoting *Ziff-Davis*, the *Promuto* court repeated that "[o]nce the express warranty is shown to have been relied on as part of the contract, the right to be indemnified does not depend on proof that the [buyer] thereafter believed the truth of the assurances." *Id.* at 644. The court next addressed *Galli's* central holding that

a buyer can waive its warranty claim if it closes the sale with "full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract." *Id.* at 645. The court continued to say that proof of whether sellers knew that any factual statement in the representation was accurate is "wholly immaterial." *Id.* at 647. The *Promuto* court then found that "[t]he law is clear that in order to conclude that [buyers] have waived their right to assert a claim for breach of warranty, we must find that, prior to closing, [sellers] themselves actively disclosed to [buyers] facts which would have constituted a breach of the warranties under the terms of the [agreement]." *Id.* at 648. Continuing, the court stated that, "any information . . . that [buyers] may have gained through their own efforts, "common knowledge" or third party communications is wholly irrelevant; therefore, any issues of fact in this regard, raised by defendants are immaterial for purposes of this motion." *Id.* at 649. The court upheld summary judgment for the buyer.

{65}     This line of cases shows that reliance and the materiality of a buyer's knowledge of facts which fall within the subject matter of the warranty may play to entirely different conclusions in contract warranty actions and in tort fraud claims. The difference can be further understood by reviewing the decisions in *Weiner v. Snapple Beverage*, ___ F.Supp.3d ___, 2010 U.S. Dist. Lexis 79647 (S.D.N.Y. 2010) and *In Re S'holders Litig., IBP, Inc.*, 789 A.2d 14 (Del. Chancery 2001), which the parties discuss in their briefs.

{66}     The Court is satisfied, as a matter of law, that the warranties and representations of APA Sections 3.7, 3.18, 3.25 and the indemnity provisions of 10.1.1 were a "basis of the bargain." Accordingly, the Court holds that Defendant relied on these warranties. The fact that Defendant relied on them, however, does not necessarily mean that Defendant can recover, even if the warranties were breached.

{67}    Pursuant to the line of New York cases discussed above, the Court then must consider whether the warranties were breached, and if so, whether any breach was waived.

{68}    In determining whether the Section 3.7 warranty was breached, the Court concludes that it is immaterial whether Plaintiffs actually knew all the facts regarding Global at the Closing Date necessary to determine whether the warranty was true as of that date. Rather the inquiry is whether the warranty was true or not at the Closing Date, all facts considered. The Court believes New York uses an objective standard such that the Court need not determine whether Plaintiffs made their representations in good faith. For purposes of contract, the warranted facts are either true or they are not. If they are not true, then separate issues arise whether Defendant knew that they were not true and therefore waived a claim for breach.

{69}    When approaching the issue whether any breach has been waived, the Court must parse Defendant's knowledge as to that which came from the Plaintiffs and that which may have or could have come otherwise. This contrasts with the approach to the element of reasonable reliance in tort claims. Likewise, the Plaintiffs' actual knowledge and intent is relevant to the tort claims.

{70}    APA Section 3.7 warrants that except for matters disclosed on Schedule 3.7 (which matters do not constitute a Material Adverse Effect), there has been: (l) no event or circumstance has occurred which constitutes a Material Adverse Effect. By definition, a Material Adverse Effect includes any change or effect that could reasonably be expected to be materially adverse. (APA Exhibit A–6.) Pursuant to *Promuto,* the Court understands that the breach inquiry is whether this statement is true, irrespective of whether Plaintiffs believed it to be true, so that the inquiry is an objective one that inquires whether a person aware of all facts would reasonably

conclude that there had been a Material Adverse Effect. So stated, the Court concludes that is no material dispute and that the Section 3.7 warranty was breached.[12] The parenthetical statement at the end of Section 7 precludes any findings that Schedule 3.7 excepts matters as to Global from the warranty of Section 3.7.

{71}    APA Section 3.18 warrants that except as set forth on Schedule 3.18 (i) . . . none of the customers . . . cancelled, terminated or otherwise materially altered the rate or amount of sales or purchases or notified the Business of any intention to do [so]. Sellers included Schedule 3.18 which indicated that: "[t]he anticipated sales volume from Global Imaging Systems (GISX) appears to be diminishing due to their acquisition by Xerox in April, 2007." Unlike Section 3.7, Section 3.18 does not warrant that the matters excepted by the accompanying schedule do not rise to the level of a Material Adverse Impact. The Court concludes that Schedule 3.18 excepted Global from the customer warranties of Section 3.18, so that the warranty of Section 3.18 was not breached. But, that does not insulate Schedule 3.18 from an inquiry whether it violated the warranty of Section 3.25.

{72}    Schedule 3.18 is a document furnished in connection with the Closing that falls within the scope of APA Section 3.25, which warrants that all documents delivered pursuant to the APA neither contain an untrue

---

[12] Even if the standard were a subjective one, the Court believes the evidence demonstrates that Sellers as of the Closing Date reasonably believed that the Xerox acquisition would be a Material Adverse Effect. It also appears that Plaintiffs may have actually intended to advise Defendant that Plaintiffs knew the Xerox acquisition would have an impact on Global sales which could be material, but that Plaintiffs would not warrant the extent of that effect. That is, Plaintiffs may have intended to except the Global acquisition from any warranty of no adverse effects. But, the effect of the parenthetical is to warrant that matters disclosed in an accompanying schedule are not a Material Adverse Effect. The Court believes that the factual issues appropriately play out as an issue of waiver which raises the question whether Defendant knew based on the combination of information provided by Plaintiffs fully informed Defendant that the effects from the Global acquisition would be as of the Closing Date a Material Adverse Effect and that Defendant elected to close the transaction with that knowledge.

statement of fact nor omit a material fact necessary to prevent the statement from being misleading. The issue of whether the Section 3.25 warranty was breached in the first instance and whether any breach of Section 3.7 was waived may merge, as Section 3.25 invites both objective and subjective consideration.

{73} The Court does not purport to list every single fact that may be both material and disputed. The Court does conclude, however, that the material issues of fact include whether Defendant closed the transaction with full knowledge and acceptance based on information provided by the Plaintiffs that there was at the Closing Date a Material Adverse Effect as a result of Xerox's acquisition of Global, thereby making any warranty to the contrary untrue. In resolving this issue, information provided by Plaintiffs would not necessarily be limited to the disclosures contained in Schedule 3.7 and Schedule 3.18. Those disclosures may be found alone to be inadequate to provide the basis of knowledge upon which a waiver would rest, but those disclosures could be supplemented by other information provided by Plaintiffs adequate to prove a waiver. As an example, the finder of fact could conclude that the information learned by TLG was adequate to support a waiver, because TLG represented to customers that it was representing the Sellers as it gathered information and it concluded there was a materially adverse impact. A finder of fact might conclude that this information was then made known to Defendant and adequate for Defendant to have "full knowledge" that the acquisition had led to a Material Adverse Effect as of the Closing Date. The finder of fact could instead conclude that the information gained by TLG was not adequate to conclude that Defendant was fully knowledgeable on the Closing Date that the acquisition was a Material Adverse Effect while at the same time concluding that the lack of certainty as to the Global situation also means that Plaintiffs' statement in their disclosures are not misleading within the scope of Section 3.25. Again, the Court reads *Galli* to require that the buyer have full knowledge that the warranties were

breached, but does not require that buyer, once knowledgeable of such breach, must also have all knowledge equal to that of the seller.

{74} In sum, the Court holds that Defendant relied on the Section 3 warranties which were a basis of the bargain. The Court concludes that the Section 3.7 warranty was breached and that the Section 3.18 warranty was not breached. There is a material dispute as to whether the warranty of Section 3.25 was breached, and if so, whether such breach was waived. There is a material dispute whether Defendant waived the breach of the Section 3.7 warranty.

{75} Accordingly, both Plaintiffs' Motion for Summary Judgment and Defendant's Motion for Summary Judgment are GRANTED IN PART and DENIED IN PART as to the contract warranty claims.

## VII. DEFENDANT'S SETTLEMENT AGREEMENT CLAIM

{76} Defendant alleges that the 1999 ESP/iESP Settlement Agreement is a "contract related to confidentiality" that should have been disclosed and provided to Defendant prior to the Closing Date pursuant to Sections 2.4 (g)[13] and 3.16.1 of the APA, entitling Defendant to indemnification. Defendant has moved for partial summary judgment with respect to liability on its Settlement Agreement Claim asserting that there is no genuine issue of material fact, and that it is entitled to summary judgment as a matter of law.

---

[13] The Court is uncertain as to the extent of the record, but believes that the Settlement Agreement remained among ESP's business records following the transaction. Plaintiffs state in their brief that the agreement "itself was within the books and records that remained at the ESP facility in Zebulon and was within the possession of the Buyer [Defendant] from the date of closing forward." (Pls.' Legal Mem. in Supp. of Their Mot. for Summ. J. and Resp. to Def.'s Mot. for Summ. J. 34.) The more significant question is whether it should have been specifically disclosed, as opposed to a claim that Plaintiffs never delivered the agreement to Defendant. In any event, if there was a violation of the warranty that no such agreement exists, it would seemingly dispose of any claim that the Plaintiffs failed to deliver a copy of it.

{77}     Plaintiffs assert that they are entitled to summary judgment on Defendant's Settlement Agreement Claim because the Settlement Agreement is not a "confidential" contract as contemplated by Section 3.16.1 of the APA because the Settlement Agreement itself expressly allows for disclosing the retraction letter. Plaintiffs also contend that the warranty is essentially irrelevant because Defendant was made aware of the existence of the Settlement Agreement through institutional knowledge.  Plaintiffs further argue that Defendant cannot make a claim under this warranty because it was not a party to the agreement and therefore should have faced no liability.  The Court believes the latter arguments are more in the nature of a defense to any claim of damages that might flow from a breach, as opposed to a defense to whether the warranty was actually breached in the first instance.

{78}     The initial question is whether the Settlement Agreement constitutes a "confidential" contract in the first instance.  The Court believes this to be a close call which it is reluctant to make based solely on the record which it has received and the treatment in the briefs.  Clearly, the Settlement Agreement contains provisions that make certain provisions of the agreement confidential.  However, the Settlement Agreement can also be read to allow the disclosure of the retraction letter in certain instances.  The Court cannot tell if any such instance was at play here.  The Court also notes that if the Settlement Agreement is viewed in isolation, and there were no additional violation of Section 3 warranties proven, the claim may not rise to the level in amount necessary to be actionable under the indemnity clause as provided by the limitations of Section 10.1.2.

{79}     While the Court had some inclination toward granting summary judgment for Plaintiffs on this claim, in light of the fact that the case will proceed on other issues, and the Court's uncertainty as to the underlying facts, the Court DENIES summary judgment to either party on this claim.

## VIII. DEFENDANT'S TORT CLAIMS

{80}   Defendant's counterclaims present multiple tort claims in addition to the breach of warranty claims.   There are facts common to both claims, and there is unquestionably an overlap of evidence between the tort claims and the contract claims.   Plaintiffs contend that the claims are entirely duplicative.  Defendant urges that there are facts relevant to the tort claims that are not relevant to the warranty claims.   The essential tort claim is that Sellers intentionally misrepresented the Global relationship (including an outright misstatement that a December meeting had occurred) and intentionally foreclosed Defendant's ability to make further investigation to learn true facts.[14]

{81}   The Court finds it significant that the APA itself reflects that the parties contemplated by contract and tort actions that may arise from misstatements in connection with the transaction and then included remedy provisions for each. The Court believes the parties should be restricted to their agreement and claims should be resolved as contract claims.  Defendant has been consistent in its argument that the Court should apply the New York standard and divorce all tort considerations from its warranty considerations.  In fairness, the Defendant should also accept that the warranty provisions control the outcome of the case.

{82}   Under New York law, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract has been violated." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987).  The holding in *Project Gamma Acquisition Corp. v. PPG Indus., Inc.*, 2009 NY Slip Op 31321U, at *18 (Sup. Ct. N.Y. Co. 2009) (citations omitted) is instructive.

---

[14] Defendant presents a summary of the facts it contends are not governed by the warranty claims at page 20 of its reply brief.

To the extent that plaintiffs' fraud causes of action are based on the falsity of the representation and warranties contained in the ASA itself, these claims are merely duplicative of plaintiff's breach of contract action. . .  Here, the alleged fraudulent representations, on which plaintiffs claim to have relied, are the very contractual representations and warranties upon which plaintiffs assert their breach of contract claim and are neither collateral or extraneous to the ASA, but an essential element thereof.  Our courts have held that, where, as here, the only fraud alleged to have occurred is by virtue of, and arising out of, the breach of the representations and warranties contained in the agreement itself, the claim is properly dismissed as duplicative of the breach of contract claim. . . .

Plaintiff's cause of action for fraudulent concealment also must be dismissed.  Where a fraudulent concealment is alleged, a plaintiff must, in addition to other elements of fraud, plead that the defendant had a duty to disclose material information and failed to do so. . . .  Generally, absent a fiduciary relationship between the parties, a duty to disclose arises only where one party has superior knowledge that is not readily accessible to another, and that party knows the other party is acting on the basis of mistaken knowledge. . . .

*Project Gamma Acquisition Corp.* at \*18–19 (citations omitted).  The court dismissed the negligent misrepresentation claim on similar grounds.  *Id.* at \*20.  *See also IMO Indus., Inc. v. Alvis PLC*, 95 N.Y.2d  767 (2000).[15]

{83}    Under New York law, actual fraud requires clear and convincing evidence of "(1) a misrepresentation or a material omission of fact which was false and known to be false by the defendant, (2) made for the purpose of inducing the other party to rely upon it, (3) justifiable reliance by the other party on the material omission, and (4) injury." *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 395–396 (S.D.N.Y. 2010) (quoting *Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2nd Cir. 2009).  New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transaction and the

---

[15] A similar result would obtain under North Carolina law.  *See, e.g., Broussard v. Meineke Disc. Muffler Shops,* 155 F.3d 331 (4th Cir. 1998); *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 229 S.E.2d 297 (1976).

business they are acquiring. *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 03 Civ. 3748 (DAB), 2006 U.S. Dist. LEXIS 4270, at *23 (S.D.N.Y. Jan. 31, 2006 (*citing Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984); *Abrahami v. UPC Constr. Co., Inc.,* 224 A.D.2d 231, 234 (1st Dept. 1996). In order to establish a claim for fraudulent concealment, a plaintiff must prove each of the elements of fraud and one additional element: a duty to disclose material information allegedly concealed. *Doehla v. Wathne Ltd.*, 98 Civ. 6087 (CHS), 1999 U.S. Dist. LEXIS 11787 (S.D.N.Y. Aug. 2, 1999) (*citing Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33 (N.Y. App. Div. 1st Dep't 1996).

{84} Beyond finding that contract remedies should control, the Court concludes that the factual record is adequate to conclude as a matter of law that any fraud claim cannot succeed because Defendant cannot demonstrate reasonable reliance. Reliance in the tort context is not limited to only the knowledge supplied by the seller. The inquiry extends to Defendant's entire knowledge, and further examines whether Defendant discharged its obligation to undertake reasonable inquiry to protect its own interest. Unquestionably, Defendant knew in the first instance from Schedule 3.7 and Schedule 3.18 that Global sales were decreasing at least to some degree. It is further undisputed that thereafter the TLG due diligence study gathered further evidence that could support a conclusion that there was an anticipated material loss of sales. Even though TLG estimated the loss at less than the amount of loss sales referred to in drafts of the Harvard Review and Zebulon Review,[16] and even if there was some confusion in what was being reported, in the face of that information, it is clear that Defendant was sufficiently alert to proceed with additional inquiries of Cole. It is also clear that the disclosures in Schedule 3.7 and Schedule 3.18 were sufficient to prompt Defendant's lender to make similar inquiries, although the lenders had not been further advised of the information deleted from the TLG report. Defendant then elected to rely exclusively on Cole for

---

[16] And the parties dispute whether these actually constitute projections of lost sales.

its follow-up and decided to make no further inquiry, which might have included, for example, direct inquiry of Global management.   The Court does not believe that this record supports a finding that Sellers fraudulently concealed or prevented Defendant from any ability to make such further inquiry as Defendant thought appropriate to resolve questions which had been raised.   The Defendant may well be able to rely on Plaintiffs warranties, but those warranties should determine whether Defendant is entitled to recover.[17]

{85}   The testimony that gives the Court the greatest concern is that which suggests that Cole may have affirmatively misrepresented that a ESP/Global meeting had occurred in December 2007 with good result, knowing that the meeting had not yet occurred or that Plaintiffs manipulated December sales figures. Nevertheless, the Court finds that Defendant elected to accept Cole's assertions without further inquiry, going even so far as electing not to advise their own lenders of information of which they had learned through their due diligence study.   In the tort context, its choice is relevant.

{86}   The more significant point is, however, that the Court believes that Cole's representations were at the heart of the warranties in Section 3.7 and Section 3.18, that contract provides for remedy for misstatements, and that the claims should be a matter of contract rather than tort.

{87}   Considering the record as a whole, the Court concludes that the case should proceed solely on the basis of the contract claims and that the fraud related claims should be dismissed.   Plaintiffs' Motion for Summary Judgment on the tort claims is

---

[17] The Court has been mindful of Defendant's argument that its fraudulent concealment claim should be viewed with recognition that information of which it learned during TLG's due diligence efforts came late because ESP would not allow the due diligence customer investigation until very shortly before closing.  Even so, the Court cannot conclude that Cole prevented Defendant from extending the Closing Date to perform such further investigation as necessary.  The Court does not perceive any duty independent from the contract itself which gives rise for an independent fraudulent inducement claim.

GRANTED, and Defendant's Motion for Summary Judgment on the tort claims is
DENIED.

## IX. DEFENDANT'S NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM

{88}    As indicated, the Court concludes that Defendant's North Carolina statutory claim is barred by application of the APA's choice of law provision. Should the Court have elected to apply North Carolina law, it would have granted Plaintiffs' summary judgment on this claim for much the same reasons as it dismissed the tort claims, allowing the case to proceed solely as to contract claims. While certainly under North Carolina precedent, a Chapter 75 claim may lie even where the supporting facts fall short of proof of actual fraud, like New York, North Carolina is reluctant to allow an independent claim to proceed when the contract itself represents negotiated remedies for violation of contractual warranties and representations. *See, e.g., Broussard v. Meineke Muffler, supra n.15.* While the good faith of the party charged with Chapter 75 liabilities may not be relevant, a Chapter 75 claim can be defeated when the claimant is found not have adequately protected his own interests. Thus, "[r]ecovery according to Chapter 75 is limited to those situations when a plaintiff can show that the plaintiff detrimentally relied upon a statement or misrepresentation and he or she 'suffered actual injury as a proximate result of the defendant's deceptive statement or misrepresentation.'" *Forbes v. Par Ten Group, Inc.*, 99 N.C. App. 587, 601, 394 S.E.2d 643, 651 (1990) (citation omitted), *disc. review denied*, 328 N.C. 89, 402 S.E.2d 824 (1991); *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593–94, 619 S.E.2d 577, 582–83 (2005) (articulating that as an element of a Chapter 75 claim).

{89}    Plaintiffs have further urged that Defendant should not in any event have the benefit of a Chapter 75 claim because it was not, at the time of closing, a North Carolina resident and that Chapter 75 should does not protect a foreign resident suing for an injury sustained outside of North Carolina. *See The 'In' Porters, S.A. v.*

*Hanes Printables, Inc.*, 663 F. Supp. 494, 501–02 (M.D.N.C. 1987).  The Court would not have applied this limiting doctrine to this case involving the acquisition of an ongoing business operating in North Carolina.

{90}    Again, the significant point is that the Court is persuaded that the contract claims are adequate to provide the remedies Defendant seeks if those claims can be proven, justifying a dismissal of the Chapter 75 claim should North Carolina law apply.  *See Allied Distributors, Inc. v. Latrobe Brewing Co.*, 847 F. Supp. 376, 379 (E.D.N.C. 1993); *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 418 S.E.2d 694, 700 (1992).

## X.  CONCLUSION

{91}    In summary, the matter should proceed on these issues:

1.      Did Plaintiffs breach the warranty of APA Section 3.25 in addition their breach of the warranty of Section 3.7?

2.      Did Plaintiffs breach APA Sections 2.4 and 3.16.1 because it did not disclose the Settlement Agreement?

3.      Did Defendant waive any or all breaches of warranty?

4.      If a warranty was breached and the breach was not waived, what damages were proximately caused by any such breaches?

It is so ORDERED this 2nd day of May 2011.