Frank A. GALLI, Una G. Galli, John D. Yeager, Elizabeth M. Yeager, Plaintiffs–Appellees,

v.

James T. METZ, Jr., Kathleen M. Metz, Defendants–Appellants.

No. 1704, Docket 92–7036.

United States Court of Appeals, Second Circuit.

Argued June 24, 1992.

Decided Aug. 24, 1992.

James M. Reilly (Frederick B. Galt, Herzog, Engstrom & Koplovitz, P.C., Albany,

N.Y., of counsel), for defendants-appellants.

H. Neal Conolly (Michael J. Hutter, Thuillez, Ford, Gold & Conolly, Albany, N.Y., of counsel), for plaintiffs-appellees.

Before: NEWMAN, KEARSE and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Defendants James T. Metz and Kathleen M. Metz (hereinafter "Metz" or "buyers") appeal from a decision, following a bench trial, awarding plaintiffs Frank A. Galli, Una G. Galli, John D. Yeager and Elizabeth M. Yeager (collectively, "Galli and Yeager" or "sellers") $2,686,621.70 for breach of contract. Metz principally asserts that the district court erred in concluding that Galli and Yeager did not breach warranties in the contract. Metz also raises a series of objections to the district court's interpretation of the contract.

*Background*

This case arises out of a dispute between the purchasers and sellers of Betuna Corporation ("Betuna") and Betuna's subsidiaries, Peterson Petroleum Corp. ("Peterson Petroleum" or "Peterson") and Pulver–Simmons–Mulhern, Inc. ("PSM") (collectively, "the companies"). In the summer of 1986, Yeager and Galli, the owners of Betuna, began negotiating with Metz for the sale of the three companies. After extensive negotiations, the parties agreed to terms, and on December 27, 1986 simultaneously signed a stock purchase agreement and closed the deal. In exchange for the stock of Betuna, Metz paid three quarters of a million dollars into Peterson Petroleum at the closing, which inured to the benefit of Yeager and Galli through Peterson's pension plan. Metz also signed two promissory notes (one to the Yeagers and one to the Gallis) for $800,000 each, payable in monthly installments of $7,416.11 over the succeeding five years. Each note contained an acceleration clause entitling the holder to demand payment of the entire value of the note following a default of greater than 30 days on any single payment.

Because the deal closed six months after the last financial statement dated June 30, 1986, the parties agreed to adjust the purchase price to reflect any changes in financial circumstances. In addition, Metz obtained extensive warranties from the sellers, Galli and Yeager, to protect against any liabilities not reflected on those balance sheets.

Shortly after the closing, the deal soured. When the first monthly payment on the promissory notes came due at the end of January, 1987, Metz refused to pay the full $7,416.11 and instead offered Galli and Yeager $2,317.54. Galli and Yeager refused this tender, and attempted to negotiate with Metz in order to settle their differences.

Meanwhile, Metz began to suspect that all was not well with Betuna and its subsidiaries. On March 20, 1987, the New York State Department of Taxation and Finance assessed Peterson Petroleum $333,322.28 for motor fuel taxes for 1984 and 1985. Around the same time, a customer of Peterson Petroleum, Bray Terminals, Inc. sued Peterson claiming Peterson was liable for gross receipt taxes paid by Bray Terminals. Metz also learned that Peterson had been named as a third-party defendant in a Massachusetts environmental suit.

In July 1987, after settlement negotiations broke off, Galli and Yeager invoked the acceleration clause of the promissory notes and sued Metz for breach of contract. Galli and Yeager sought recovery of the full $1.6 million face value of the notes as well as other damages based on alleged breaches of the stock purchase agreement.

Metz answered with a counterclaim asserting breaches of warranties, RICO violations, and assorted common law frauds. Metz also claimed entitlement to take certain offsets to the purchase price under the contract.

Three years later, the case went to trial. The bench trial, spanning several months but totalling only seven days of testimony, concluded on June 20, 1991. In a memorandum-decision filed September 9, 1991, the district court found for plaintiffs, the sellers Galli and Yeager, on the breach of

contract claim and rejected Metz' counterclaims except as to issues not relevant here. The district court also awarded Galli and Yeager attorneys' fees to be determined in a subsequent proceeding. The district court entered judgment pursuant to rule 54(b), and Metz appealed.

We now reverse in part and remand.

*Discussion*

Metz raises four issues on this appeal. First, Metz contends that the district court erred in concluding that Galli and Yeager did not breach warranties in the stock purchase agreement. Second, Metz argues that the district court should not have taken parol evidence to construe a provision of the contract. Third, Metz asserts that the district court improperly counted uncollectible accounts receivable in calculating Metz' entitlement to an offset in the purchase price. Finally, Metz suggests that the district court clearly erred in finding that Metz prevented Yeager and Galli from collecting certain refunds. We address these contentions in turn.

1. Breach of Warranty.

At trial, Metz raised, as a counterclaim, that Yeager and Galli had breached several warranties contained in the stock purchase agreement. Metz contended that under that agreement, sellers' breach of warranty suspended buyers' obligation to make payments on the promissory notes. The district court rejected most of Metz' asserted breaches, concluded that Metz had failed to establish damages from several other breaches, and granted Metz a reduction in the purchase price for one acknowledged breach of warranty. The district court did not explicitly address Metz' contention that any breach of warranty entitled him to suspend payments. On appeal, Metz challenges the district court's rulings with respect to five alleged breaches. We will consider each in turn.

a. Tax claim

■ Two months before the closing, a New York tax examiner informed sellers that Peterson Petroleum might be assessed $221,000 in back taxes. Sellers failed to disclose this to the buyers. Three months after the closing, the New York tax authorities asserted that Peterson owed over $300,000 in back taxes.

Sellers contended at trial that they believed in good faith that the state had decided not to pursue the tax liability. Sellers explained that after the tax examiner notified them of his intent to recommend the assessment to his superior, sellers requested that the examiner call them back if the superior approved. The examiner never made such a call. Accordingly, sellers argued that they had a good faith reason not to disclose the tax audit at the closing. The district court concurred, and found that Galli and Yeager did not breach any warranties by failing to disclose the audit. We disagree.

Under the stock purchase agreement, the sellers warranted that "[t]here are no claims, legal actions, suits, arbitrations, governmental investigations in progress or pending". This warranty shifted the risk of an unknown tax claim from buyers to sellers. *See Metropolitan Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir.1946) (L. Hand, J.). Sellers' belief that no tax claim was pending is irrelevant. *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209, 1223 (S.D.N.Y.1979), *aff'd*, 632 F.2d 1025 (2d Cir.1980). Because a claim unquestionably was pending, the sellers breached this warranty.

The consequences of this breach are less clear. Peterson has not paid the tax claim. Galli and Yeager have assumed the defense of the claim and have stipulated that they will stay collection of the judgment rendered here in the amount in contest in the tax claim until the Division of Tax Appeals renders a final decision. They have also stipulated that Metz may offset any judgment rendered against Peterson Petroleum on the tax claim against the judgment rendered in this case. Metz asserts that he sustained some costs in defending the tax claim prior to the sellers' assumption of the defense, but the record does not reveal the amount. Further proceedings are necessary to clarify the matter. We therefore

remand to allow the district court to determine Metz' defense costs.

■ Metz also contends that sellers' breach suspended all of Metz' obligations on the promissory notes. Metz points to paragraph 11 of the contract:

> 11. *CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS.* All obligations of Buyers hereunder are subject to the fulfillment of each of the following conditions at or prior to the closing ...:
>
> (a) All representations and warranties of ... Sellers contained herein ... shall be true and correct. when made and as of the closing.

From paragraph 11, Metz contends that the truth of every warranty is a condition precedent to all of buyers' obligations under the contract. Metz argues that the falsity of the warranty with respect to the tax claim thus constitutes a failure of a condition precedent, suspending his obligation to pay on the promissory notes until damages from the breach are ascertained.

Galli and Yeager respond that the contract contains several other provisions creating far less extreme remedies for warranty breaches. Thus, paragraph 9(k) empowers the buyers to set off against the promissory notes any charges incurred as a result of liabilities known to the sellers but not disclosed at the closing. Similarly, paragraph 7 provides that "[a]ny unknown tax liability of Betuna or the Subsidiaries arising from the business operations prior to closing may be set off by the Buyers against the amount of any [tax] refund ... or against the [promissory] note." Finally, paragraph 13 obligates seller to indemnify buyer for any injuries resulting from a breach of warranty. Galli and Yeager forcefully contend that it would be strange for the contract to provide both for offsets and complete suspension of payments. The offset option would be superfluous, since no buyer would ever choose to make reduced payments instead of no payments at all. Galli and Yeager propose instead that we should interpret paragraph 11 to create only a pre-closing remedy for the buyer.

In short, we are presented with two conflicting interpretations of the contract, one of which is consistent with the plain language of paragraph 11, and the other which makes sense of the entire framework of the agreement. Neither side introduced any parol evidence before the district court on the meaning of this provision, and although the proper interpretation of paragraph 11 was in issue below, the district court did not express any view on the question. We thus write on a clean slate. *See Rentways Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 349, 126 N.E.2d 271, 274 (1955).

■ The contract provides that New York law governs. Under New York law an interpretation of a contract that has "the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988). Rather, an interpretation that "gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985). *See, e.g., Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38 (1961); *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174, 133 N.E.2d 688 (1956); *Fleischman v. Furgueson*, 223 N.Y. 235, 239, 119 N.E. 400, 401 (1918).

Thus, when interpreting this contract we must consider the entire contract and choose the interpretation of paragraph 11 "which best accords with the sense of the remainder of the contract." *Rentways, Inc.*, 308 N.Y. at 347, 126 N.E.2d at 273. We find that Galli and Yeager's interpretation of paragraph 11 as creating only a pre-closing remedy for the buyer best accords with the remainder of the contract because it does not make paragraphs 13, 9(k) and 7 superfluous. Accordingly, we hold that Metz is not entitled to suspend payments pending determination of the damages suffered for breach of warranty.

### b. Gulf Oil Settlement

The sellers warranted that, between the June 30 balance sheet and the December 27 closing, they had not "settled or agreed to settle any litigation, action or proceeding before any court ... relating to Sellers or their property." Galli and Yeager admit that they breached this warranty by settling a lawsuit initiated by Peterson against Gulf Oil for $295,000. Sellers applied the proceeds of the settlement to pay Peterson's obligation to a pension plan of which sellers were the principal beneficiaries. The district court found that buyers were not injured by this breach, since, by wiping out the debt to the pension fund, the settlement increased the assets of Peterson Petroleum. Since buyers do not contend that they would have reaped a larger settlement from the Gulf litigation than that achieved by sellers, we agree with the district court's analysis.

### c. Massachusetts environmental litigation

Less than a month before the closing, John Yeager received a letter informing him that a piece of property in Catskill, New York, on which Peterson had formerly operated a gas station, contained "hazardous waste materials which exceed[ ] United States Environmental Protection Agency advisory levels." Two years after the closing, Peterson was named as a third-party defendant in an environmental litigation relating to contamination at that Catskill site, and at a site in Holyoke, Massachusetts.

Yeager conceded below that he had known about the contamination at Catskill for twelve years. Nonetheless, sellers warranted that "neither Betuna nor the Sellers know or have reason to be aware of any facts which might result in any ... claim ... which might adversely affect the business or condition ... of Betuna or its properties." Metz argues that since sellers knew of the Catskill contamination, sellers breached this warranty.

The district court disagreed. The court determined that "the problem at the Catskill site was ... disclosed to [Metz] prior to the [closing]". On appeal, Metz does not challenge this factual determination. Instead, Metz contends that his knowledge of the Catskill contamination is irrelevant, since reliance is not an element of breach of warranty under New York law. We agree with this general proposition, but nonetheless do not agree that it mandates a judgment for Metz.

Metz relies on *CBS Inc. v. Ziff–Davis Publishing Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990). In *Ziff–Davis*, the purchaser (CBS) signed a purchase agreement with the seller (Ziff–Davis) in which Ziff–Davis warranted the accuracy of certain financial statements. Between the signing of the agreement and the closing, CBS conducted its own investigation and began to suspect that Ziff–Davis' numbers were wrong. CBS informed Ziff–Davis of this view. Ziff–Davis angrily denied the charges and threatened to sue CBS if CBS did not go through with the closing. CBS agreed to close, but expressly stated that the dispute over the accuracy of the financial statements continued and that by closing, CBS did not waive any rights under the agreement. After closing, CBS sued Ziff–Davis for breach of warranty, and the trial court dismissed, reasoning that CBS had not relied on the truth of the warranty. The appellate division affirmed.

The Court of Appeals reversed. The court treated the warranty as a bargained-for contractual term whereby CBS bought Ziff's promise that the financial terms were accurate. *Id.* at 503, 554 N.Y.S.2d 449, 553 N.E.2d 997. The court ruled that "[o]nce the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled." *Id.*

In other words, express warranties are "as much a part of the contract as any other term." *Id.* CBS's belief that the terms might not be accurate no more voided the warranty than a fruit purchaser's suspicions that a fruit seller might not be

able to deliver the goods would void a contract for the sale of fruit.

■ While *Ziff–Davis* does curtail the role of reliance in breach of warranty actions, the case is of limited value to Metz. In *Ziff–Davis*, there was a dispute at the time of closing as to the accuracy of particular warranties. *Ziff–Davis* has far less force where the parties agree at closing that certain warranties are not accurate. Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach. In that situation, unless the buyer expressly preserves his rights under the warranties (as CBS did in *Ziff–Davis*), we think the buyer has waived the breach.

Thus, whether Metz' knowledge of the Catskill contamination vitiates his warranty breach claim depends on the circumstances in which Metz learned of the problem. At trial, Yeager testified both that he had specifically disclosed the Catskill problem to Metz and that the problem was common knowledge. Metz denied that Yeager had specifically informed him of the problem. The district court did not resolve the factual ambiguity, holding only that "the problem at the Catskill site was … disclosed to the defendants." Presumably, the district court meant that sellers told Metz of the problem. If this is the case, then sellers would have a strong argument that Metz waived the warranties.

However, the possibility lingers that the district court found only that the Catskill problem was common knowledge. In that event, it is possible that a third person disclosed the problems to Metz and that Metz purchased the sellers' warranty as insurance against any future claims. Then, under *Ziff–Davis*, Metz would have a strong argument. Since the district court made no findings on who disclosed the Catskill problem to Metz, we must remand this question for further factual development.

In the event that the district court does not find a waiver, we note our disagreement with that court's conclusion that the breach did not injure Metz. At the least, the record suggests that Metz may have incurred defense costs in the Massachusetts litigation. In the event that the litigation eventually results in liability for Peterson, that injury would also be attributable to Galli and Yeager's breach. Accordingly, if the district court on remand concludes that Metz did not waive this claim, it should take further evidence on the damages issue.

The district court also rejected Metz' breach of warranty claim with respect to the Holyoke site. The district court found the evidence of environmental problems at Holyoke insufficient. Metz has not pointed to evidence that would cause us to believe this factual determination to be clearly erroneous. Accordingly, we affirm the district court's determination that sellers did not breach any warranties with respect to the Holyoke site.

d. Bray Terminals

■ In December of 1985, one year before the closing, attorneys for Bray Terminals, Inc., sent a letter to Peterson Petroleum asserting that Peterson owed Bray $26,804.95, and threatening to "take all appropriate actions to recover the amount due". Sellers did not disclose this claim. Metz asserted at trial that sellers breached their promise that there were no claims threatened against Betuna or its subsidiaries.

The district court rejected Metz' argument, stating that "it is at best tenuous to suggest that Bray 'threatened' a lawsuit against Peterson." This factual determination is clearly erroneous. A statement in a lawyer's letter, demanding payment on a debt, that the lawyer is authorized to take "all appropriate actions" carries with it the unmistakable threat of litigation. This implication is inescapable from the letter's further statement that Bray would also seek to recover for "the costs, disbursements and attorneys fees incurred in securing such relief"—a statement that makes sense only in the context of a threat of future litigation. Accordingly, we reject

the district court's determination that Bray did not threaten a lawsuit. We find that Galli and Yeager breached the warranty by failing to disclose the threat.

Again, however, it is not clear how much the breach damaged Metz. Bray has filed suit, but has yet to obtain a recovery. For now, Metz should be given the opportunity on remand to prove his legal costs in defending against Bray's claim. In the event that Bray eventually recovers, Metz will be entitled to demand indemnification from the sellers.

### e. Becraft security interest

The district court found that on July 31, 1986, PSM granted the Becraft trust a security interest in certain payments owing to PSM from Agway Petroleum Corp. The court determined this grant breached the warranty that since the June 30, 1986 financials, the sellers had not "mortgaged, pledged or subjected to lien, charge, security interest or any other encumbrances or restrictions any of its property or business or its assets". The court determined, however, that sellers' lawyer had informed Metz' lawyer of the security interest prior to the closing. Thus, the court concluded that Metz "apparently waived" the warranty and denied Metz any recovery.

Metz does not dispute the district court's factual conclusion that Galli and Yeager informed Metz of the breach. Metz contends, on the strength of *Ziff–Davis*, that buyers' awareness of the breach is irrelevant. We disagree. As stated earlier, *Ziff–Davis* does not eliminate the possibility of a waiver. The district court found a waiver, and Metz does not seriously challenge this conclusion. Accordingly, we affirm the district court's refusal to grant relief on this counterclaim.

To sum up, we reverse the district court's rejection of Metz' counterclaims relating to (1) the tax claim, (2) the Bray Terminals claim, and (3) the Catskill portion of the Massachusetts environmental litigation claim. We remand (1) and (2) for further fact finding on damages. We remand (3) for further proceedings to determine whether Metz waived the breach, and,

if not, the extent of Metz' injuries. We affirm the district court's conclusion that the sellers' breach with respect to the Gulf Oil settlement did not injure Metz and that Metz waived any claim relating to the Becraft security interest. We hold that sellers' breaches do not entitle Metz to suspend payments on the promissory notes.

### 2. Retained Gallonage.

 In addition to his breach of warranty counterclaims, Metz also sought an offset in the purchase price pursuant to paragraph 1(b) of the stock purchase agreement. Paragraph 1(b) provides that:

[a]ny decrease in the accrued obligation due to Pulver–Simmons–Mulhern, Inc. from Agway Petroleum Corp. for payment of retained gallonage as further described in paragraph "13a" of that certain option agreement between Pulver–Simmons–Mulhern, Inc. and Agway Petroleum Corp. dated October 3, 1985 below $650,000 shall reduce the purchase price provided for herein by the amount of such reduction below $650,000 ....

The October 3 agreement granted Agway Petroleum the option to purchase the assets of PSM. In the event that Agway exercised the option, PSM agreed not to compete with Agway in either the propane or petroleum products business and to use its best efforts to allow Agway to retain PSM's customers. As consideration for the covenant not to compete in the propane business, paragraph 13 (labeled "Propane Fixed Sum") states that Agway will pay PSM $125,000 in three annual installments. Paragraph 13a (labeled "Retained Gallonage") sets out a complex formula for determining how much Agway will pay for PSM's promise not to compete with Agway in the petroleum products business. The formula is keyed to the number of gallons of heating oil and kerosene that Agway would sell to former customers of PSM.

Agway paid PSM $569,803.65 pursuant to the retained gallonage formula under paragraph 13a of the 1985 option agreement and $125,000 under paragraph 13 of that agreement. At trial Metz asserted a right to an offset in the purchase price of

$80,196.35—the difference between $650,-000, the amount promised in paragraph 1(b) of the stock purchase agreement, and $569,803.65, the amount Agway paid under paragraph 13a. Sellers responded that the $650,000 promised in paragraph 1(b) related to the entire amount receivable under the option agreement from Agway, i.e., both the $125,000 payment under paragraph 13 and the $569,803.65 under paragraph 13a, and that since the total exceeded $650,000, no offset could be taken.

Despite the explicit reference in paragraph 1(b) to paragraph 13a, the district court agreed with the sellers. The court found paragraph 13a ambiguous and admitted parol evidence on the intent of the parties with respect to paragraph 1(b). The court then credited John Yeager's testimony that the parties understood that paragraphs 13 and 13a would be read together and denied the offset. We disagree with the court's analysis.

 Because parties are entitled to rely on the enforceability of written agreements, "[p]arol evidence is admissible to aid in the interpretation of a contract only when the language of the contract is ambiguous." *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir. 1990). A contract is ambiguous where it is "readily susceptible" to more than one interpretation. *Care Travel Co. v. Pan American World Airways,* 944 F.2d 983, 988 (2d Cir.1991).

Here, paragraph 1(b) of the stock purchase agreement is unmistakably clear. The paragraph directs the reader to calculate the retained gallonage paid under 13a of the option agreement, and, if that amount is less than $650,000, adjust the purchase price accordingly. Paragraph 1(b) is not readily susceptible of any other interpretation.

Indeed, the district court did not find any ambiguity in paragraph 1(b). Rather, the court found ambiguity in paragraph 13a of the option agreement. Specifically, the court focused on language in paragraph 13a that "[i]t is agreed and understood that Agway will not have an adequate remedy at law *for a breach of this section 13*".

(emphasis added). From this confusing reference, the district court determined that the drafters of the option agreement read sections 13 and 13a together. The court then determined that this fusion of sections 13 and 13a in the minds of the drafters of the option agreement rendered ambiguous the stock purchase agreement's reference to paragraph 13a.

It is at this point that we part company with the district court's analysis. Paragraph 1(b) does not refer to the amount receivable from Agway under paragraph 13a. Instead, it refers to the amount receivable from Agway "for payment of retained gallonage as further described in paragraph '13a'". Whatever ambiguity there may be in section 13a, that ambiguity does not relate to the formula for calculating retained gallonage. Since it is plain on the face of the option agreement that the only amount receivable for retained gallonage is that described in paragraph 13a of the option agreement, paragraph 1(b) of the stock purchase agreement is not reasonably susceptible of more than one meaning. The district court should not have admitted parol evidence on this question. We reverse and award Metz an offset of $80,196.35.

3. Aged Accounts Receivables.

 Paragraph 1(a) of the stock purchase agreement creates a right for the buyer to a purchase price reduction to reflect any decline in the companies' balance sheets. The paragraph states that:

Any increase in the excess of liabilities over the assets greater than FIVE HUNDRED THOUSAND SEVEN HUNDRED SEVENTY–FIVE ($500,775.00) DOLLARS, shall be a reduction against the purchase price and shall reduce the promissory notes accordingly as finally determined after adjustments to all the items listed on Schedule B.

Schedule B contains a list of the liabilities and assets of the companies as of the date of the last financial statement, June 30, 1986. Among the assets included on the schedule are accounts receivable of $250,-000. The sellers warranted that the finan-

cial statements underlying schedule B were prepared "in accordance with generally accepted accounting principals."

At trial, sellers and buyers stipulated as to several adjustments to schedule B. The parties could not agree on several other adjustments to schedule B, and one of those disagreements remains on this appeal. Sellers requested that the district court recognize $62,285.18 in accounts receivables above what the buyers were willing to concede. Buyers contended that those accounts receivables were uncollectible since no payments had been received nine months after the closing.

The district court accepted the sellers' position, reasoning that (1) buyers had not established that the uncollectible accounts were not offset by corresponding deposits and (2) that in any event, based on parol evidence, defendants had agreed to purchase the accounts receivables on an "as is" basis. On appeal, buyers dispute both the factual conclusion that the companies held sufficient deposits to offset the possibly uncollectible accounts and the legal decision to admit parol evidence to determine that the buyers purchased the receivables "as is."

As we noted earlier, parol evidence is admissible only if the contract is ambiguous. The contract states that where there is an increase in the excess of liabilities over assets, the parties "shall reduce the promissory notes accordingly as finally determined after adjustments to all of the items listed on Schedule B." We think the phrase "as finally determined after adjustments" is "readily susceptible" of more than one interpretation. *Care Travel Co.*, 944 F.2d at 988.

The phrase might, as buyers contend, indicate that adjustments are to be made according to generally accepted accounting principals. On the other hand, it might, as the district court found, indicate that adjustments would be based on the way accounts were listed on the companies' books as of the closing. Since the contract is ambiguous, the district court properly heard parol evidence on the interpretation of this clause. Buyers do not contend that

the court's "as is" finding was clearly erroneous in light of the parol evidence. Accordingly, we affirm the district court on this point without considering the district court's factual determination with respect to the sufficiency of the deposits.

4. Gulf II Refund.

■ Under the stock purchase agreement, sellers retained the right to refunds owing to Betuna or the subsidiaries for any overcharges for petroleum products sold to the companies between March 1973 and January 1981. The contract obligated buyers to provide sellers access to any business records necessary to claim such a refund. In December 1987, Yeager and Galli received a letter from Gulf Oil authorizing them to seek a refund for overcharges from the relevant years. The letter informed Yeager and Galli that they might be entitled to a refund of as much as $72,014 if they could provide specific documentation and that they could receive a minimum refund of $28,806 without submitting any additional documentation.

Yeager and Galli then demanded that Metz turn over the corporate records necessary for providing the requested documentation. Because the parties were embroiled in litigation, Metz refused. The record does not indicate whether Yeager and Galli applied for the minimum refund, or whether that refund is still available. At trial, the district court ruled that Metz breached the contract by failing to turn over the requested documentation and awarded sellers $28,806. Metz argues on appeal that there is no foundation in the record for this award. We agree.

As Metz points out, Galli and Yeager were entitled to a $28,806 refund without getting *any* documents from Metz. Thus, by determining that Metz' breach caused $28,806 in damages, the district court in effect found that had Metz turned over the records, Galli and Yeager would have been able to obtain a refund of $28,806 *above the minimum refund of $28,806—$57,612.* There is nothing in the record to support a finding that Galli and Yeager would have been able to obtain such a refund had Metz

turned over the relevant records. Indeed, sellers had ample opportunity in pre-trial discovery to acquire access to the relevant documents and have failed to establish their entitlement to any claim above the minimum available. Accordingly, we reverse the district court's award of $28,806 as without basis in the record and dismiss this aspect of sellers' claims.

5. Sales Tax Refund.

As with refunds for overcharges, the contract entitled sellers to any refund for the $32,539.26 in taxes paid on the sale of PSM's customer lists in 1983. The contract also required Metz to allow sellers access to corporate documents necessary to pursue refund claims. In February of 1987, the New York Court of Appeals held that the sale of customer lists is not a taxable event. *Audell Petroleum Corp. v. New York State Tax Com.*, 69 N.Y.2d 818, 513 N.Y.S.2d 962, 506 N.E.2d 533 (1987). Thereupon, sellers attempted to seek a refund of the 1983 taxes, but buyers refused sellers access to necessary records. The district court found that this refusal prevented sellers from seeking a refund, and that but for the refusal, sellers would have obtained a refund of the entire $32,539.26. Buyers have pointed to nothing in the record to convince us that this determination was clearly erroneous. Accordingly, we affirm the award to plaintiffs of $32,-539.26.

Conclusion

In sum, we reverse the district court's rejection of buyers' breach of warranty claims relating to the tax claim, the Bray Terminals claim, and the Catskill portion of the Massachusetts environmental claim, and remand those claims for further proceedings on damages, and, with respect to the environmental claim, waiver. We reverse the district court's denial of a setoff to the buyers based on paragraph 1(b) of the stock purchase agreement and award buyers a setoff of $80,196.35. We affirm the district court's determination that sellers were entitled to an adjustment of $62,-285.18 for aged accounts receivables. We reverse the district court's award of $28,-806 to sellers for the Gulf II refund and dismiss sellers' refund claim. We affirm the district court's award of $32,539.26 to sellers for the sales tax refund.

Affirmed in part, reversed in part, and remanded.